Gladys Child Soars et al., Appellants, v. Soars-Lovelace, Incorporated, et al.—142 S. W. (2d) 866.

Division One, September 4, 1940.*

*NOTE: Opinion filed at May Term, 1940, June 28, 1940; motion for rehearing overruled July 23, 1940; motion to transfer to Court en Banc filed; motion overruled at September Term, 1940, September 4, 1940.

Bert Steeper for appellants.

*Roach & Brenner* for respondents.

HYDE, C.—This is an appeal from a judgment of the Circuit Court of Jackson County reversing an award of the Workmen's Compensation Commission for the death of Charles A. Soars. This

award was to the widow and children of Soars, as dependents, in the total amount of $11,442. They have appealed from the Circuit Court's judgment.

The ground of reversal was that "there was not sufficient competent evidence in the record to warrant making the award." The issue to be determined is whether or not Soars was an employee of defendant corporation, Soars-Lovelace, Incorporated, under the provisions of Section 3305(a), R. S. 1929, 12 Mo. Stat. Ann. 8238.

The applicable part of this section is, as follows: "The word 'employee' as used in this chapter shall be construed to mean every person *in the service of* any employer, as defined in this chapter, under any contract of hire, express or implied, oral or written, or under any appointment or election, but *shall not include persons whose annual average earnings exceed three thousand six hundred dollars.*" (We have italicized the controlling part.) Section 3304(a), R. S. 1929, 12 Mo. Stat. Ann. 8238, includes within the definition of employer every corporation "using the service of another for pay."

In July, 1930, Soars incorporated the Soars-Lovelace Company, "to carry on the business of designing, consulting, managing and contacting the oil refiners, the oil industry in general, and the selling of Five hundred shares of no par value stock was issued as follows: Soars, 498 shares, C. W. Lovelace, 1 share, and 1 share to their stenographer. Soars was president and treasurer of the company. Lovelace was vice-president and secretary. He did the office work until October 1, 1932, when he obtained other work because of the company's reduced income. It was understood that he might return if business improved. Soars worked principally outside the office "contacting the oil refiners, the oil industry in general, and the selling of the services of the company to such refiners, companies, or individuals." The company at first did some plant construction work having its "own construction superintendent on the job." In 1932, Soars sold 100 shares of his stock, 75 shares to H. M. Anderson, who had been employed by the company since September, 1930, and 25 shares to M. D. Overmier. Lovelace and the company's stenographer continued to hold one share each. Overmier was given an option to purchase 50 more shares at Twenty Dollars per share, in an agreement between Soars, Anderson and Overmier, dated November 12, 1932.

This agreement also contained the following provisions:

"If for any reason any one of the three parties to this agreement leaves the firm of Soars & Lovelace, Inc., he hereby agrees to sell his stock to the firm at the book value as determined by the board of directors. The sale of stock to take place at the time the party's connection with the firm is terminated.

"The salaries to be paid to the parties to this agreement are as follows:

"C. A. Soars            $500.00 per month
"H. M. Anderson       300.00 per month
"M. D. Overmier        300.00 per month

"It is understood that if the monthly income of the firm at any time is not sufficient to pay the full salaries stated above, then the total amount of money available for salaries shall be divided among the above parties in proportion to the amounts stated above."

On April 1, 1933, Anderson and Overmier left the company and obtained employment with other companies, "because the income of the company was not sufficient." They expected to return "as soon as the work of the company justified" so that they "could expect a reasonable salary for working there." Thereafter, Soars was entitled to all of the net income of the company up to his salary of five hundred dollars per month, and the only other person paid any compensation by the company was the stenographer. Soars was killed on July 13, 1933, by an explosion, while he was visiting an oil refinery at Smackover, Arkansas. After his death, Anderson came back and finished the work Soars was to do under contract with his company at another oil refinery at Smackover. He was thereafter elected president of the company but found that its business did not justify continuing its existence. Its total assets on July 1, 1933, were $1069.67; consisting of cash $8.10, accounts receivable $566.90, and furniture and fixtures $494.67. It owed office rent of $630 and stenographer's salary $245. The company, however, had some contracts upon which some further payments were to be made to it when they were completed. Anderson and Lovelace both stated that Soars was "the boss;" that no one could "fire or discharge" him; that he "came and went just as he pleased;" that "he had no superior officer;" that there was no one "connected with the company who gave directions to Mr. Soars or instructions to him what to do," but that the others would only "offer suggestions;" and that the corporation was "the only source of income he had of any kind."

Soars's salary was $600 from July, 1930, to and including July, 1931; for August, 1931, it was $500, and for September, 1931, it was $400. All of these amounts, he received in full. For the three remaining months of 1931 and for the first ten months of 1932, his salary was entered on the books of the company as $400 for each month. During the rest of the time prior to his death (November, 1932, to and including June, 1933), his salary was entered each month as $500 for each month. However, during that whole period (October, 1931, to June, 1933) he actually received $3727.08. Therefore, during this whole three-year period of the company's existence prior to his death, the total amount of salary credited to Soars on its books was $17,900; and the actual amount of money that he received in payment thereof was $12,427.08. Of this amount $1475, received from the Danciger Oil Company for work (including expert testimony) in connection

with certain litigation in which it was involved, was not entered on the books of Soars-Lovelace, but was deposited by Soars directly in his personal account. It was explained that this was not shown on the books because this work had not been completed, and further payments were to be made upon completion. The salary account of Soars on the company's books had been balanced prior to the annual meeting of the company in July, 1933, by charging to profit and loss, $2656.19 on June 30, 1933, and $4258.87 on December 31, 1932; and with $32.06 charged to expense on December 31, 1931. Similar charges to profit and loss were made at both times to balance the salary accounts of Anderson and Overmier; and one was made in 1932 to balance the salary account of Lovelace. An accountant, who audited the company's books, found nothing to show that the company's liability for these salaries had been extinguished. Soars, in ordering the stenographer to make these charge-off entries, said "that they wouldn't be paid anyway." Anderson said the charge-offs were made pursuant to the salary agreement hereinabove set out. Lovelace said that he had agreed with Soars to have the charge-off made because there was no possibility of ever receiving any of the old unpaid salary.

We think that the Circuit Court reached the correct result because it must be held that Soars was within the terms of the exclusion clause of Section 3305(a), whether "his annual average earnings" be considered as the fixed amount of salary credited to his account on the company's books or the amount he actually received in money. Considered as the fixed amount for which he was given credit on the books, his situation was exactly that ruled in Sayles v. Kansas City Structural Steel Co., 344 Mo. 756, 128 S. W. (2d) 1046; State ex rel. Mills v. Allen, 344 Mo. 743, 128 S. W. (2d) 1040; Morse v. Potosi Tie & Lumber Co. (Mo.), 130 S. W. (2d) 477. Considering only the actual amount of money Soars received during his three years as President and chief officer of the company, he was barred by the exclusion clause, under the rule stated in the Sayles case. This was the rule actually applied to the facts in Klasing v. Fred Schmitt Contracting Co., 335 Mo. 721, 73 S. W. (2d) 1011, which was overruled by the Sayles case insofar as it went further and seemed to add requirements as to definite annual or longer term contracts, not warranted by the terms of the Workmen's Compensation Act. Claimants seek to limit consideration not only to money actually received, but to what was actually received during the year prior to Soars' death, namely, $2927.08. The language "annual *average* earnings" in the Act shows on its face that it could not be limited to one year, because that could not be an *average* of annual earnings. Clearly the average of annual earnings for the whole time of employment is to be considered where the employee had been employed more than one year "by the same employer in the grade in which the employee was employed at the time of the accident." [See Sec. 3320(b), R. S.

1929, 12 Mo. Stat. Ann., 8259.] ■ Claimants further contend that there was a change of grade, under which only the last year must be considered, because Lovelace, Anderson and Overmier all left the company during that year, "and since Soars was the only engineer then remaining with the company the duties formerly performed by all three of those above mentioned of necessity fell upon Soars." However, Soars was at all times president, chief managing officer, majority owner, and "the boss." There was no higher grade than that for him to take and, therefore, we hold that there was no change of grade.

■ Furthermore, we do not believe that the Legislature intended that the chief officer of a corporation, who owned more than three-fourths of its stock, could bring himself back under the act, at the end of any year, or at semi-annual periods, by crediting back to the corporation by book entries part of his salary, previously fixed and credited to him after the amount of such salary properly fixed and credited to him had once put him outside of it, under the terms of the exclusion clause. When the corporation once legally owed him that amount, even if he did not collect before it became insolvent, the debt would not be wiped out except by the methods provided under the Bankruptcy Laws. If he later decided to make a gift to the corporation, why should that change his status under the exclusion clause? Of course an employer should not be permitted to defraud actual employees by crediting them with more than he intended to or knew he could pay them in order to avoid the Workmen's Compensation Law. However, here Soars was "the boss" with no superior officer, whom no one could direct, control or discharge, and with power through his stock ownership to control the corporation and elect the majority of its directors. As a practical matter, he had the actual power to fix his own salary. While an executive officer may have a dual capacity so as to be also an employee under the act because of the character of his relation to the corporation and the kind of work he does, it has been frequently held that one who is both chief officer and majority owner in actual control of operations does not have the status of an employee under Workmen's Compensation Acts. [Barlow v. Shawnee Inv. Co., 229 Mo. App. 1, 48 S. W. (2d) 35; Aitchison v. Industrial Comm., 188 Wis. 218, 205 N. W. 806, 44 A. L. R. 1213; Midwest Motor Coach Co. v. Elliott (Ind.), 182 N. E. 541; Duesenberg v. Duesenberg, Inc. (Ind.), 187 N. E. 750; Donaldson v. Donaldson Co. (Minn.), 223 N. W. 772; Erickson v. Erickson Furniture Co. (Minn.), 229 N. W. 101; Brown v. Conway Elect. L. & P. Co. (N. H.), 129 Atl. 633; Hodges v. Home Mortgage Co. (N. C.), 161 S. E. 220; Carville v. Bornot & Co. (Pa.), 135 Atl. 652; Annotations 15 A. L. R. 1288, 25 A. L. R. 376, 44 A. L. R. 1217, 81 A. L. R. 644.] Our own statutory definition of employee is a "person in the service of any employer." In Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 82

S. W. (2d) 909 (see also Rutherford v. Tobin Quarries, 336 Mo. 1171, 82 S. W. (2d) 918), this court said that "the word service, as used, signifies . . . controllable service." This court also therein said that "the framers of the act had in mind the law of master and servant and the relationship, duties, rights, and limitations arising out of the same;" and that "the relationship is bottomed upon services . . . to be rendered by the servant—whether by that name or one synonymous, as workman or employee . . . to the other, whether as master or employer, and is peculiarly characterized by the right of control vested in the latter." Clearly no one had any right of control over Soars or authority even as to determining the amount of his salary; and as we pointed out in Chambers v. Macon Wholesale Grocer Co., 334 Mo. 1215, 70 S. W. (2d) 884, our act "is a 'Workmen's Compensation Act' and not an 'Employer's Compensation Act.' " We, therefore, hold that the substantial owner of an incorporated business, who completely manages and directs its entire operations, cannot bring himself under the Workmen's Compensation Act by giving back to the corporation part of his salary after it has become legally obligated to pay him an amount exceeding that which, under the exclusion clause of the Act, would also prevent him from being within it.

Claimants further assert estoppel of the insurer by the following provisions of the policy, and by the alleged charging of premium on that basis:

"If this employer is a corporation, the entire remuneration of the President, any Vice-President, Secretary, or Treasurer shall be disclosed and made subject to a premium charge at the rate applicable to the hazard to which each officer is exposed, which rate shall be applied to the actual remuneration of such officer but not in excess of $100 per week."

This policy, however, further provided, as follows:

"This renumeration and description with the estimated remuneration shall also include the President, any Vice-President, Secretary or Treasurer of this Employer, if a corporation, if actually performing such duties as are ordinarily undertaken by the superintendent, foreman or workman, but any such designated officer not so engaged shall not be included in such enumeration, description or estimated remuneration."

On the page entitled "Declarations," there were blanks filled in with a typewriter; and no other blank space was filled in to show any employees, except the following:

"Classification of Operations

"Note: If more than one classification indicate each other by (b), (c), (d), etc.

| | Estimated Total Annual Remuneration | Rate per $100 of Remuneration | Estimated Premium |
|---|---|---|---|
| 1 (a) Engineers—Consulting, Mechanical, Civil, Electrical and Mining Engineers and Architects—not engaged in actual construction (N. P. D.) ................ (8601) | $3000. | .73 | 25.00 Min. |
| (x) President, any Vice-President, Secretary or Treasurer of corporate Employer who performs duties of Superintendent, Foreman or Workman | | | |
| (2) (a) Clerical Office Employees. ............. | 1800.00 | .08 | |
| (b) Draughtsmen (engaged exclusively in the profession)—office duties only. | | | " |

This policy was issued in August, 1932, when Lovelace and Anderson were both working for the company. The amount of salary to engineers is closer to theirs than to any Soars ever drew; and it is significant that nothing is written in the space (x) provided for listing the president's salary, if he "performs duties of Superintendent, Foreman or Workman." This is certainly not very substantial support for claimants' contention. Furthermore, the Workmen's Compensation Commission must find its authority to make awards in the Workmen's Compensation Act. Like other administrative tribunals, it is a creature of the Legislature and does not have any jurisdiction or authority except that which the Legislature has conferred upon it. If the authority conferred could be enlarged by its own holdings of waiver, estoppel, or even by contract, the Commission could itself add to its own powers and create rights and duties beyond what the Legislature provided or intended. [Morse v. Potosi Tie & Lumber Co. (Mo.), 130 S. W. (2d) 477; Chambers v. Macon Wholesale Grocer Co., 334 Mo. 1215, 70 S. W. (2d) 884; 11 Am. Jur. 960-965, secs. 242-43; Public Service Comm. v. St. L.-S. F. Ry. Co., 301 Mo. 157, 256 S. W. 226; City of Columbia v. Public Service Comm., 329 Mo. 38, 43 S. W. (2d) 813; State ex rel. Empire Dist. Elec. Co. v. Public Service Comm., 339 Mo. 1188, 100 S. W. (2d) 509.] If any insurance company overcharges, or makes an improper or fraudulent charge, rights may be created against it which could be enforced at law or in equity, but that would not authorize the Workmen's Compensation Commission

720

to make awards to persons excluded by the terms of the Act or to exercise any authority that the Legislature has denied it.

The judgment is affirmed. *Bradley* and *Dalton, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.