John GAZZOLI, (Plaintiff) Appellant,

v.

STAR NOVELTY COMPANY, a Corporation, and The Fidelity and Casualty Company of New York, a Corporation, (Defendants) Respondents.

No. 30970.

St. Louis Court of Appeals.

Missouri.

Feb. 20, 1962.

Motion for Rehearing or to Transfer to Supreme Court Denied March 19, 1962.

Max M. Librach, Sidney Rubin, St. Louis, for appellant.

Luke, Cunliff & Wilson, Wm. J. McCluggage, St. Louis, for respondents.

SAMUEL A. DEW, Special Commissioner.

The appellant made claim for benefits under the Missouri Workmen's Compensation Law for bodily injuries sustained March 21, 1958. The Referee found in his favor and awarded him $9,513.38. Upon a review of that award the Industrial Commission of Missouri ruled that the appellant was not an employee of the Star Novelty Company and reversed the award rendered by the Referee in its entirety. From that ruling of the Commission an appeal was taken to the Circuit Court of the City of St. Louis. That court affirmed

the ruling of the Commission, denying the claim. An appeal was then taken to this Court from such judgment of the Circuit Court.

The sole question presented here is whether, as a matter of law, the appellant was an employee of the Star Novelty Company, a corporation, at the time his injuries were sustained, within the meaning of the Missouri Workmen's Compensation Act.

All of the facts were stipulated in writing before the Industrial Commission, which we set forth below, with deletion of such parts as are deemed not pertinent or essential.

"The Star Novelty Company is a corporation having been organized as such April 10, 1950, and qualifying as a Missouri corporation since that time. * * * The four original organizers and stockholders constituted the first Board of Directors. This corporate setup continued until April 10, 1954, when all the shares of stock held by Albert Librach and Hattye Librach were bought up. John Gazzoli and his wife were then and continued to be sole owners of the outstanding shares of stock, John Gazzoli holding 374 of the 375 outstanding and Dorothy Gazzoli, the one remaining. The Board of Directors consisted of John Gazzoli, Dorothy Gazzoli and Allen Blomenkamp (who owned no stock). Dorothy Gazzoli was listed as President on the corporate books. Allen Blomenkamp as Secretary and John Gazzoli as Vice-President and Treasurer. This formal corporate setup has continued without change until the present time.

"John Gazzoli at all times exercised full and absolute control over every facet and phase of the operation of the business since the purchase of the Librach interests. He was responsible to no one but himself. Board of Directors' meetings were held yearly to comply with corporate requirements but the meetings were purely a formal-

ity and the directors automatically ratified and approved any actions taken or contemplated by Gazzoli. He received and sought no authority from the directors. He determined who was to serve as directors. The directors had no control or direction over Gazzoli. They could not discharge Gazzoli. All authority over and direction of all the operations of the business was retained and exercised by Gazzoli.

"All hiring and firing in the operation of the business was done by Gazzoli, either personally or at his personal direction and with his approval. All employees were directly responsible to John Gazzoli. He assigned all work to be done by those so employed.

"John Gazzoli determined and set all salaries paid, including his own. He could and did take money from the business collections on his own authority. Records were, of course, kept of such withdrawals. He drew money for expenses, in whatever amounts he chose, whenever he chose, for which he was accountable to no one but himself. He could and did make loans to individuals and firms out of company money, solely on his own authority and without consultation with others connected with the company. All equipment and merchandise used by the business was purchased by Gazzoli and any financial arrangements for such purchases, if any were required, were negotiated and arranged by Gazzoli. He had and exercised absolute discretion in the use and disposition of all company assets as any other individual would with his own funds.

"John Gazzoli drew a net of $600.00 per week from Star Novelty, several times that paid anyone else carried on the payroll. Social Security and Federal Income Tax were set aside by the company, the amounts being computed to allow Gazzoli the $600.00 net. He

was provided with a form 'W-2' listing the amounts so paid and withheld for Federal Income Tax purposes. These forms indicate Gazzoli received a gross income in excess of $40,000.00 per year from Star Novelty. Since its inception, for Federal income tax purposes, the Star Novelty Company has listed Gazzoli as an employee in its regular quarterly returns in reporting and paying withholding and Social Security taxes.

"The corporation paid Federal and State income tax every year on its profits which approximated $35,000, $70,000 and $50,000 for the fiscal years 1956, 1957 and 1958, respectively.

"The Star Novelty Company has never officially paid a dividend on its outstanding stock. The corporation, since the Librach interests were purchased, has had substantial surpluses, as above indicated, out of which dividends could have been paid. These surpluses were permitted to accumulate by the Board of Directors over whom Gazzoli had complete control. The sums so accumulated were deposited and used as directed by Gazzoli. * * * The corporate structure was maintained without change and Gazzoli still retains and owns all of the outstanding shares of stock except the one ·(out of 375) listed in his wife's name.

"Upon formation of the corporation, a 'Standard Workmem's Compensation and Employers' Liability Policy' of insurance was purchased from The Fidelity & Casualty Company of New York. This policy, following the standard form, provided coverage for the Star Novelty Company's liability under the Workmen's Compensation Law of Missouri and provided the usual additional coverages for other liability and for inspection. As is customary, the premium charged for the policy was based on the Star Novelty Company's payroll. From time. to time, the insurance company's auditors computed the premium due based on the payroll records submitted by the Star Novelty Company. The money drawn by Gazzoli was included in the payroll audit although rated, as is customary, as $100.00 per week, i. e., premium was collected on the money drawn by Gazzoli only on the basis of $5,200.00 per year, not on the full amount.

"The Star Novelty Company was engaged in the general vending machine business, being known in the trade as 'operators' of phonograph machines and pinball machines. * * * Each week a collector, or route man, for the Star Novelty Company checked the various machines on location, * * *. At the end of the day, the route man returned to the office with his collection of assorted change. The money was locked in the safe overnight. On the following morning, the money was sorted, counted, tabulated, accounted for, entered into the books of record and then put into wrappings preparatory to being taken to the bank for deposit by an armored messenger service which came daily between eleven and twelve o'clock noon in order to get the money to the bank before the close of business.

"Gazzoli customarily, in addition to general supervision, personally participated in these regular morning activities. He helped the girls count, wrap and sort the change, or answered the telephones for the girls if they were occupied in the counting, etc., of the change. The entire operation usually required about two or three hours to complete with Gazzoli's help. Without Gazzoli's active participation, either in the physical handling of the money or in answering the telephones, this operation would have taken longer unless additional help were hired.

"Gazzoli customarily worked from about 7:45 A.M. until 10:00 P.M. daily, except Sunday, in the business. * * * This entailed a great deal of what could be termed public (customer) relations such as calling on the customers, entertaining them, loaning them money in some instances and generally satisfying, if possible, their many and varied complaints. Gazzoli also acted as general 'trouble shooter,' answering calls for emergency service if his regular servicemen were unavailable, assisting in repairs of equipment and generally 'filling in' when the route men or other workers were unavailable for any reason.

* * * * * *

"On March 21, 1958, at about 9:00 A.M., John Gazzoli was in the office of the Star Novelty Company, helping with the handling of the previous night's collections as he customarily did. In this particular instance, he was seated at the telephone desk in the middle section or office. The girls who regularly answered the telephones, were engaged in the counting operation and Gazzoli was filling in, answering telephones for them.

"Three armed and masked men came through the front door and entered the middle office. Gazzoli, realizing he was about to be held up, seized a pistol from a drawer nearby. The men opened fire and Gazzoli returned it. One of the men was hit by one of Gazzoli's shots and was captured by Harry Dorn, the office manager, who had come up from the repair shop on hearing the shooting. The other two men fled and made good their escape. The attempted robbery was unsuccessful. * * *

"In the affray, Gazzoli was seriously wounded receiving six bullet wounds about his arms and body and was bleeding profusely. * * *

"He was confined in the hospital for a period of 4½ weeks and remained at home following his release for an additional period of ten weeks. It was almost six months before he returned to active participation in the business of the Star Novelty Company. Gazzoli has received and paid the following bills for medical, nursing and hospital services incurred within 90 days following the injury:

| | |
|---|---|
| Hospital and Nursing | $1,978.32 |
| Joseph J. Gitt, M. D. | 75.00 |
| Raymond Charnas, M. D. | 200.00 |
| Medicines | 9.96 |
| Drs. Signorelli and Cassell | 2,500.00 |
| | $4,763.28 |

"As a result of the injuries sustained in this described affray, Gazzoli has sustained permanent partial disability amounting to thirty (30%) percent of the man as a whole."

The facts having been agreed upon, it is the function, duty and power of this court upon appeal to review the judgment of the Circuit Court solely as a matter of law, and in so doing we are not bound by the legal conclusions of the Industrial Commission. Corp v. Joplin Cement Co. et al., Mo. en banc, 337 S.W.2d 252, 257; Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 82 S.W.2d 909; Rutherford v. Tobin Quarries, 336 Mo. 1171, 82 S.W. 2d 918. In such a review it is required of this court to determine if the award of the Commission "is supported by competent and substantial evidence on the whole record," and if the "Commission could have reasonably made its findings and reached its results on a consideration of all the evidence before it." Corp v. Joplin Cement Co., supra, (337 S.W.2d l. c. 258); Brown v. Anthony Mfg. Co. et al., Mo., 311 S.W. 2d 23, 27; Mo.Const., Art. V, § 22, V.A. M.S.

The appellant maintains that the agreed statement of facts proves him to have been, as a matter of law, a qualified employee

under the Missouri Workmen's Compensation Law and entitled to an award for his compensation. The respondents vigorously insist that the admitted facts prove that, as a matter of law, the appellant was not an employee of Star Novelty Company within the meaning of the Missouri Workmen's Compensation Law, is not entitled to an award as such, and that the judgment of the Circuit Court affirming the ruling of the Commission to that effect should be affirmed.

The appellant first emphasizes the admonition of the Workmen's Compensation Act of Missouri that its provisions "shall be liberally construed with a view to the public welfare * * *," Section 287.800, R.S.Mo., 1959, V.A.M.S.; and the interpretation of the mandatory requirement by the Supreme Court, which quoted with approval the following: "This requires us to adopt such a construction as will extend its provisions to the largest possible class of employees, and to restrict those excluded from its provisions to the smallest possible class." Klasing v. Fred Schmitt Contracting Co., 335 Mo. 721, 73 S.W.2d 1011, 1014.

Our attention is next called by appellant to the definitions in the Missouri Workmen's Compensation Act of the terms "employee" and "employer." Section 287.020(1) provides: " * * * 'Employee.' * * * Every person in the service of an employer, as defined in this chapter, under any contract of hire, express or implied, oral or written, or under any appointment or election." Section 287.030(1) provides: " * * * 'Employer' * * * Every person, partnership, association, corporation, trustee, receiver, the legal representatives of a deceased employer, and every other person, including any person or corporation operating a railroad and any public service corporation, using the service of another for pay."

For his further interpretation of the law the appellant relies chiefly upon the dual capacity doctrine. That theory is explained in 99 C.J.S. Workmen's Compensation § 82 (b), p. 302, which we quote at length:

"Although the doctrine has been rejected, the majority of the cases adhere to what may be called the dual capacity doctrine; that is, that an officer, director, or stockholder of a corporation will not be denied compensation merely because he is such officer, director, or stockholder if, as a matter of fact, at the time of the injury he is engaged in performing manual labor or the ordinary duties of a workman and receives pay therefor in the capacity of an employee, or if he is engaged in an employment palpably separate and distinct from the official duties falling on him as an officer of the corporation.

\*     \*     \*     \*     \*     \*

"Whether an officer, director, or stockholder is an employee within the act depends largely, in each individual case, on the particular facts and circumstances of the case. Consideration must be given to the actual business relations between the corporation and the officer, the privileges indulged in with respect to working hours, the compensation received, whether the officer is subject to any control by the corporation in his activities, and the legislative intent as expressed in statutory definitions. Consideration must also be given to the degree of control exercised over the business; and where one claiming compensation is practically the whole corporation, he cannot be an employee as manifestly he could not be both employer and employee; he could not employ himself.

"Holding stock in a corporation is not necessarily inconsistent with being an employee thereof, and this is so even though claimant owns all or a majority of the stock, although it has been held that those who own the majority of the stock, dictate the policy of the corporation, and manage its prudential affairs are considered in the same category as partners in the management of the business, and do not sustain the relation

of employee to the company so as to come within the act."

Pertinent to this issue, it is said in Larson's Workmen's Compensation Law, Vol. 1, Sec. 54.21, at page 788: "Moreover, the work, to qualify as employment, should be done under the control of someone," and in Section 54.22, at page 789: "Stock ownership as such does not, of course, defeat employee status. But when stock ownership becomes so preponderant that the stockholder is for practical purposes the alter ego of the corporation, the compensation acts, which are inclined to be realistic rather than technical, will disregard the corporate entity and treat the stockholder as the employer."

"Thus, the owner of practically all the issued stock of a corporation of which he is president and general manager, who is responsible to no one for his business acts, who is under no one's direction, and who takes all the earnings of the corporation as salary, is not its employee within the meaning of a workmen's compensation act, so as to render the corporation and its insurance carrier liable for injuries received in the course of the employment." 58 Am. Jur. page 679, Section 150.

Respondents contend that the law fixing the status of appellant as a qualified employee or otherwise under the Workmen's Compensation Law is fully determined by the Supreme Court of Missouri in the case of Soars v. Soars-Lovelace, Inc., 346 Mo. 710, 142 S.W.2d 866, hereinafter analyzed. Appellant, anticipating the citation of that case, disputes its applicability to the case at bar. He claims it is to be distinguished on the ground that at the time that case arose the statute here involved excluded employees whose average annual earnings exceeded $3600, an exemption long since deleted by the Legislature from the present statute. Appellant asserts that the court in the Soars case in reality dealt with the pecuniary feature of the statute as it then existed, rather than the effect of the decedent's relationship with the corporation, and that

the court's comments on the latter issue were obiter dicta.

A careful exposition of the Soars case, supra, becomes essential. In that case the widow and children of Charles Soars claimed and were awarded compensation for his death in 1933, under the Workmen's Compensation Act. Upon review, the Circuit Court reversed the award and an appeal was then had to the Supreme Court. The sole issue on appeal was whether or not Soars was an employee of the corporation under Section 3305(a), R.S.Mo., 1929 (Sec. 287.020, 1959, as amended). That statute then defined an "employee" for the purposes of the Workmen's Compensation Act as follows: " 'The word "employee" as used in this chapter shall be construed to mean every person *in the service* of any employer, as defined in this chapter, under any contract of hire, express or implied, oral or written, or under any appointment or election, but *shall not include persons whose annual average earnings exceed three thousand six hundred dollars.' "  (142 S.W.2d 1. c. 867.)  Section 3304(a) R.S.Mo., 1929, defined "employer" to include a corporation using the services of another for pay.  (Sec. 287.030, R.S.Mo., 1959, V.A.M.S., as amended.)

The Supreme Court pointed out in the Soars case that the evidence showed Soars had been credited for some earnings in excess of $3600; that he had not accepted all of it but had ordered some of it credited back to the corporation and charged to profit and loss; that at the time of his death he and his stenographer were the only ones in the business who were paid a salary; that he was the president and general manager of the corporation; majority owner of the stock; that he had no superior officer over him; that no one could discharge him, and that he was, in fact, the "boss" of the business.

The court held that the amount of Soars' earnings exceeded the statutory limitation for qualified employees under the Workmen's Compensation Act, even though he

had not received some of it or had some of it credited back to the corporation. The court said that the Legislature did not intend that a chief officer of a corporation and owner of three-fourths of its stock "could *bring* himself back under the act, at the end of any year, * * * by crediting back to the corporation by book entries part of his salary, previously fixed and credited to him after the amount of such salary properly fixed and credited to him had once put him outside of it, under the terms of the exclusion clause." (142 S.W.2d l. c. 869— Italics supplied.) The court further said that such amounts owed to the decedent and not collected were, nevertheless, earnings and the gift of the same to the corporation would not change his status under the exclusion clause.

"However," said the court in the Soars case (142 S.W.2d at l. c. 869) : "here Soars was 'the boss' with no superior officer, whom no one could direct, control or discharge, and with power through his stock ownership to control the corporation and elect the majority of its directors. As a practical matter, he had the actual power to fix his own salary. While an executive officer may have a dual capacity so as to be also an employee under the act because of the character of his relation to the corporation and the kind of work he does, it has been frequently held that one who is both chief officer and majority owner in actual control of operations does not have the status of an employee under Workmen's Compensation Acts (citations)." The court added that the Act was a "Workmen's Compensation Act," and not an "Employer's Compensation Act."

Concluding that feature of the case the court said in the Soars case, (142 S.W.2d at page 870) : "We, therefore, hold that the substantial owner of an incorporated business, who completely manages and directs its entire operations, cannot *bring* himself under the Workmen's Compensation Act by giving back to the Corporation part of his salary after it has become legally obligated to pay him an amount exceeding that which,

under the exclusion clause of the Act, would *also* prevent him from being within it." (Italics supplied).

It is evident from an analysis of the Soars case that the court based its decision on the fact (1) that because of the decedent's relationship with the corporation he did not sustain the status of an employee under the Workmen's Compensation Act, and (2) that, even if that were not the law, he could not "bring" himself within the Act by ordering on his own sole authority, parts of his salary to be shown on the books of the corporation as credited to profit and loss, sufficient to escape the statutory limitation on earnings under the Act which "also" excluded him. Both of these issues were interrelated and evidence on each was pertinent to the other.

We do not agree that the opinion in the Soars case is inapplicable to the case at bar nor that the comments contained in it relative to the effect of decedent's relationship with the corporation upon his status as an employee were obiter dicta. The case is, we think, determinative of the appellant's claim for compensation herein and precludes his right of recovery. Riss & Co. v. Wallace, 239 Mo.App. 979, 195 S.W.2d 881 ; In re Moody's Estate, 229 Mo. App. 625, 83 S.W.2d 141 ; State ex rel. Weast v. Moore, 164 Mo.App. 649, 147 S.W. 551.

The appellant mentions in his brief the admitted fact that respondent Fidelity and Casualty Company has for years collected premiums on its policy covering the liability of respondent Star Novelty Company for the Workmen's Compensation, which premiums were based on the latter's payroll which included the amounts drawn by the appellant. However that may be, the Soars case is final authority also on that feature, appearing likewise therein, and it is stated in 142 S.W.2d at page 871: "If any insurance company overcharges, or makes an improper or fraudulent charge, rights may be created against it which could be enforced at law or in equity, but that would not authorize the Workmen's Compensation

Commission to make awards to persons excluded by the terms of the Act or to exercise any authority that the Legislature has denied it."

From the foregoing, we conclude that the judgment of the Circuit Court, affirming the ruling of the Workmen's Compensation Commission, should be affirmed. The Special Commissioner so recommends.

PER CURIAM.

The foregoing opinion by DEW, Special Commissioner, is adopted as the opinion of the Court.

The judgment of the trial court, affirming the ruling of the Workmen's Compensation Commission, is accordingly affirmed.

ANDERSON, P. J., and WOLFE, J., concur.

RUDDY, J., not sitting.