ESTERINA DICHELLO *v.* HOLGRATH
CORPORATION ET AL.
(AC 16386)

O'Connell, C. J., and Dupont and Healey, Js.

Argued February 23—officially released July 7, 1998

*Robert A. Izzo*, for the appellant (plaintiff).

*Timothy E. Welsh*, for the appellees (defendants).

*Opinion*

HEALEY, J. The plaintiff appeals from the decision of the compensation review board (board) affirming the commissioner's award of reimbursement for disability payments made to the plaintiff. We affirm the decision of the board.

A brief overview of the background is appropriate at this point. On May 7, 1984, the plaintiff, Esterina Dichello, and the defendant Holgrath Corporation entered into a voluntary agreement, approved by the workers' compensation commissioner, which provided that the plaintiff had a 30 percent loss of use of her right hand as the result of a compensable event that occurred at Holgrath on September 6, 1983.[1] Payments under the agreement would have run through September 4, 1985, unless interrupted. On February 28, 1985,

---

[1] The history given by the plaintiff to Ira Spar, an orthopedist, in November 1983, was that her right middle finger had been pierced by a needle in the course of her employment. In examining the plaintiff, Spar determined that she suffered from carpal tunnel syndrome.

the defendant filed a form 36,[2] seeking an order to terminate payment to the plaintiff of temporary total disability benefits as well as for reimbursement of certain payments made to her. After a tortuous history, the commissioner rendered his finding and award on December 19, 1994. That decision included the commissioner's finding that the plaintiff's temporary total disability had ended on January 9, 1985, that the defendant was entitled to "the reimbursement of all payments in excess of those representing permanent partial disability for bilateral carpal tunnel syndrome" and that the charges of certain health providers, which the plaintiff maintained should be the obligation of the defendant, were the responsibility of the plaintiff.[3]

In addition to those facts, we add the following from the commissioner's finding and award. James Sabshin, a neurosurgeon, was noted on the voluntary agreement of May 7, 1984, as the treating physician. Gene D'Angelo, the plaintiff's family physician, referred her to Ira Spar, an orthopedist, who first saw the plaintiff on November 3, 1983. Spar, after examining the plaintiff and considering her history, felt that she suffered from carpal tunnel syndrome in the right hand and tendinitis. The plaintiff had no complaints involving her left hand, and Spar's examination did not reveal any abnormalities. There were no complaints or findings involving the shoulders or elbows. Spar prescribed medication and applied a plaster splint.

Upon the plaintiff's return to Spar on November 17, 1983, he advised the plaintiff to undergo a nerve conduction study. On December 17, 1983, a right hand nerve

---

[2] An employer cannot terminate or reduce total or partial disability payments to an employee without first notifying the workers' compensation commission and the employee of his intent to do so. See General Statutes §§ 31-296 and 31-321.

[3] The commissioner also found that the plaintiff's permanent partial disability payments resumed on January 8, 1985.

conduction study revealed a slowing of the median nerve at the carpal tunnel. The plaintiff never returned to Spar. On the recommendation of a family member, the plaintiff undertook treatment with Anthony Scialla, a general surgeon, on November 21, 1983. Scialla referred the plaintiff to Sabshin, who first saw the plaintiff on December 8, 1983. Scialla, however, continued to see the plaintiff through February, 1992. His March 27, 1987 note indicates that the plaintiff was on six medications, but "neither he or she knew what they were and he would not prescribe anything else." The plaintiff complained to Sabshin of pain and numbness in the right hand, but his examination revealed "no significant problems in other areas" and she had no other complaints.

Before making a diagnosis, Sabshin sent the plaintiff to Norman Werdiger for a nerve conduction study. After that study, Sabshin saw the plaintiff on January 5, 1984, and recommended a right carpal tunnel release, which was done on January 27, 1984. Sabshin followed the plaintiff during her recovery and on February 23, 1984, she complained of left wrist pain. In May, 1984, Sabshin recommended nerve conduction studies of both hands and both wrists. Werdiger conducted these studies, which showed problems with the left wrist as well as showing that the nerve conduction in the right hand had not improved after the surgery.

On June 6, 1984, Sabshin recommended left carpal tunnel surgery, which was performed on July 30, 1984, on the left wrist. The plaintiff underwent a course of physical therapy, and on January 7, 1985, Sabshin approved the plaintiff's return to restricted work. On April 18, 1985, the plaintiff complained to Sabshin of cervical, bilateral shoulder, elbow, wrist and hand pain "resulting from any motion of either hand." An examination, however, revealed no basis for the plaintiff's complaints. She requested a letter from Sabshin indicating

total disability but he refused to issue such a letter. Because of the multiplicity of the plaintiff's complaints, Sabshin again referred her to Werdiger, who could not relate all of her symptoms to a single diagnosis, although he did note possible diagnoses of reflex sympathetic dystrophy and dysesthetic type pain. When the plaintiff saw Werdiger on May 9, 1985, he recommended repeat surgery for the right carpal tunnel syndrome.

After another examination of the plaintiff by Sabshin on June 18, 1985, he referred her to David Goodkind, a hand surgery specialist. The latter recommended repeat surgery on the right wrist, but the plaintiff declined. On July 16 and September 24, 1985, Sabshin met with the plaintiff and her daughter, and again repeated his recommendation of right carpal tunnel surgery. Werdiger again saw the plaintiff in May, 1984, and he noted that his examination was difficult due to her complaints of pain. He, however, found no problem with her left arm proximate to the wrist or shoulder. He did diagnose bilateral carpal tunnel syndrome, worse on the right wrist.

After a later examination on April 22, 1985, following the plaintiff's complaints of pain in her hands, arms, shoulders, neck, legs and thighs, Werdiger indicated that his examination was difficult because of her complaints of extreme pain even on the slightest movement of her fingers. Werdiger opined that her complaints did not fit any established neurological pattern, that he could find no cause for her symptoms, that he was skeptical of the degree of pain she was expressing, that he did not attribute any of her multiple complaints to her carpal tunnel syndrome and that she consider referral to a pain clinic. On August 6, 1983, Werdiger again saw her on referral by Sabshin. At that time, she complained of pain in both hands, neck, lower back and right leg, as well as severe pain at the slightest touch, even when she was asked to look from side to

side, stick her tongue out or smile. Yet Werdiger was able to move all of the plaintiff's joints through a full range of motion and found that her reflexes were normal. A formal sensory examination, however, was not possible because of her failure to cooperate. Werdiger thought that she had chronic pain syndrome and "he could not document a cause for it."

At the defendant's request the plaintiff was examined and evaluated by Marvin Arons,[4] a specialist in hand surgery, on October 13 and December 6, 1987, and February 25, 1988. As part of his examination and evaluation process, Arons reviewed and summarized thirty-one reports of prior examinations and tests. On her first visit to Arons, the plaintiff complained of pain in both upper extremities, neck and upper back, as well as numbness in the fingers of both hands. She sat motionless with her hands in her lap. When she cried, her husband wiped her tears and when she needed to blow her nose, her husband held the tissue. The examination was limited because of her complaints of pain with the slightest touch or movement. After this examination, Arons referred her to Gordon Hutchinson, a rheumatologist, and Moshe Hasbani, a neurologist. On her second visit, Arons described her as suffering, depressed, dejected, anguished, groaning and breathing deeply, with difficulty walking without assistance from her husband. The plaintiff's husband and daughter told Arons that she did nothing at home and that she needed help to eat. Arons diagnosed compensable carpal tunnel syndrome bilaterally and thought that the plaintiff had developed a cycle of physiologic and emotional disability that led to bilateral chronic pain disability. He felt that she was a psychiatric case. He felt that the carpal tunnel syndrome "had been incipient but dormant, until aggravated by the compensable injury." He described

---

[4] The deposition of Arons was introduced into evidence before the trial commissioner.

her prognosis as "grim." On her third and last visit to Arons, the plaintiff appeared so disabled that she almost had to be carried into his office, and he likened her to a paraplegic or a person with multiple sclerosis. He stated that he had never seen anything like it.

Later, during his deposition, Arons was shown a videotape and photographs taken during surveillance of the plaintiff.[5] The plaintiff did not deny that she was the person who appeared in the videotape and photographs. The photographs were taken on October 12, 1989, and showed the plaintiff walking with a shoulder strap over her left shoulder and opening a car door with her left hand and entering the driver's side. On the same day, she drove from her home to a parking area at the rear of a dental office, which she entered. When she left the dental office, she drove to a chiropractic office. She appeared to walk and drive without difficulty. On October 28, 1989, she was again observed driving and walking to do errands. On November 10, 1989, a videotape was taken that showed "the [plaintiff] walking normally, swinging her arms, a shoulder bag strap over her shoulder, opening and closing the driver's side of a car, backing the car and driving away, all without apparent difficulty. She made stops at a post office, a bank, a drug store and a bakery." The defendant had paid workers' compensation benefits during the period covered by the surveillance.

When Arons saw the videotape of the plaintiff, he described himself as "astonished, in a state of shock," and he felt that the patient that he had examined nineteen months prior to the videotape "could not have done what the videotape showed . . . without something of great significance having occurred." He noted the possibilities to be: (1) malingering and feigning her prior

---

[5] The report of the surveillance included notes from October 12 and 28, 1989; November 8, 9, 10, 16 and 29, 1989; December 1, 5 and 7, 1989; and January 8, 9, 13 and 15, 1992.

condition; (2) psychiatric and rehabilitation therapy; or (3) a miraculous intervention. The commissioner found no evidence to sustain the second and third possibilities.

On the basis of the facts found and the reasonable inferences drawn therefrom, the commissioner found that (1) the plaintiff's bilateral carpal tunnel syndrome had been dormant until aggravated by her workplace activity and was therefore compensable, (2) the plaintiff's permanent partial disability, as evidenced by the voluntary agreement, was interrupted for the reinstatement of temporary total disability on July 10, 1984, when she underwent left carpal tunnel surgery, (3) the plaintiff's temporary total disability ended on January 7, 1985, and permanent partial disability payments resumed on January 8, 1985, (4) the defendant is entitled to reimbursement of all payments in excess of those representing permanent partial disability for bilateral carpal tunnel syndrome, (5) Sabshin was the authorized treating physician and, because Werdiger and Goodkind were seen on referral by Sabshin, their charges are the responsibility of the defendant, (6) the charges of Arons and the providers to whom he made referrals are the responsibility of the defendant and (7) those providers not referred to in (5) or (6) are not in the chain of authorization and, therefore, their charges are not the responsibility of the defendant. The commissioner's decision of December 19, 1994, constituted the approval of the defendant's form 36, which was filed in 1985.

After the issuance of the commissioner's decision, the plaintiff filed a number of motions. The first was her motion for extension of time to file a motion to correct and reasons for appeal dated December 22, 1994. On January 12, 1995, after the commissioner's decision of December 19, 1994, the plaintiff filed a

"Motion to Open Record to Submit Additional Docu-
mentary Medical Evidence."[6] The thrust of this motion
was to have the case reopened for the purpose of adding
certain medical reports to the record that the plaintiff
claimed would require a change in the commissioner's
decision that the defendant was not responsible for
the charges of certain health providers. This motion to
reopen was denied on January 13, 1995. On April 6,
1995, the plaintiff filed a motion to correct "the finding
and award by adding certain facts" concerning the
imposition of certain medical charges on her. This
motion was claimed on April 6, 1995. On April 12, 1995,
the plaintiff filed a "Statement of Reasons of Appeal,"
setting out a number of reasons for the board to vacate
the commissioner's decision. Some months later, on
September 25, 1996, the plaintiff filed an "Amended
Statement of Reasons for Appeal." Among the reasons
set out is that "the commissioner's decision should be
[reversed] because he failed to issue his decision within
120 days of the end of the Formal Hearings as required
by Connecticut General Statutes, Section 31-300." This
is the first time the plaintiff raises an issue of the alleged
untimeliness of the commissioner's finding and award
in any of the documents filed by the plaintiff *after* the
commissioner's award of December 19, 1994.

On appeal, the board affirmed the decision of the
commissioner. In doing so, the board held (1) that the
plaintiff had, by her conduct, waived the time limit
required by § 31-300[7] and that the plaintiff cannot now
have that decision vacated for lateness, (2) that the
commissioner correctly determined that the plaintiff's

---

[6] On December 27, 1994, the plaintiff filed her "Petition for Review" of
the December 19, 1994 decision by the compensation review board. See
General Statutes § 31-301.

[7] General Statutes § 31-300 provides in relevant part: "As soon as may be
after the conclusion of any hearing, but not later than one hundred twenty
days after such conclusion, the commissioner shall send to each party a
written copy of his findings and award. . . ."

total disability ended on January 7, 1985, and (3) that the commissioner correctly determined that the charges of certain health care providers were the obligation of the plaintiff and not the defendant. This appeal followed.[8]

I

We turn first to the plaintiff's claim that the board improperly affirmed the commissioner's award of December 19, 1994, because that decision was issued over 500 days after the record was closed, in contravention of the 120 day mandate of § 31-300. Implicit in this claim is the contention that the board also improperly concluded that the plaintiff had waived the 120 day limit of § 31-300. We affirm the decision of the board.

In discussing this issue, it is important to keep in mind that the commissioner's hearings concluded on July 13, 1993. Therefore, for purposes of § 31-300, the 120th day after the hearings concluded was November

---

[8] In her brief in this court, the plaintiff claims that the commissioner failed to render a decision on the defendant's form 36, which was filed on February 28, 1985, until December 19, 1994, almost ten years later, in violation of her right to due process of law. In doing so, she refers "to the basic protections of due process of law embodied in the state of Connecticut and United States constitutions." The claim is briefed in one paragraph without the citation of any authority. She again referred to it in oral argument and again failed to provide any supporting authority. We decline to review this claim.

Even if the plaintiff's mere mention of the due process clause in her brief to the compensation review board could be construed as distinctly raising the issue at the trial level, we decline to review this claim because of inadequate briefing to this court. " 'Assignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court.' " *Bowman* v. *1477 Central Avenue Apartments, Inc.*, 203 Conn. 246, 249–50 n.3, 524 A.2d 610 (1987), quoting *Hayes* v. *Smith*, 194 Conn. 52, 66 n.12, 480 A.2d 425 (1984); *State* v. *Hart*, 23 Conn. App. 746, 748 n.1, 585 A.2d 103 (1991), rev'd in part on other grounds, 221 Conn. 595, 605 A.2d 1366 (1992). This also applies to constitutional claims. *Hayes* v. *Smith*, supra, 66 n.12; *Rodriguez* v. *Mallory Battery Co.*, 188 Conn. 145, 149, 448 A.2d 829 (1982); *Mazur* v. *Blum*, 184 Conn. 116, 120, 441 A.2d 65 (1981).

10, 1993. The commissioner's decision, however, was dated December 19, 1994.

"Administrative agencies are tribunals of limited jurisdiction and their jurisdiction is dependent entirely upon the validity of the statutes vesting them with power and they cannot confer jurisdiction upon themselves. *Regents of University System of Georgia* v. *Carroll*, 338 U.S. 586, 597–98, 70 S. Ct. 370, 94 L. Ed. 363 (1950); *Gerson* v. *Industrial Accident Commission*, 188 Cal. App. 2d 735, 738–39, 11 Cal. Rptr. 1 (1961); *Bair* v. *Blue Ribbon, Inc.*, 256 Iowa 660, 663, 129 N.W.2d 85 (1964); *Soars* v. *Soars-Lovelace, Inc.*, 346 Mo. 710, 719, 142 S.W.2d 866 (1940) (workers' compensation commission); *Fink* v. *Cole*, 1 N.Y.2d 48, 52, 133 N.E.2d 691 (1956); 2 Am. Jur. 2d, Administrative Law § 328 [1962]. We have recognized that '[i]t is clear that an administrative body must act strictly within its statutory authority, within constitutional limitations and in a lawful manner. . . . It cannot modify, abridge or otherwise change the statutory provisions, under which it acquires authority unless the statutes expressly grant it that power.' *Waterbury* v. *Commission on Human Rights & Opportunities*, 160 Conn. 226, 230, 278 A.2d 771 (1971) . . . ." *Castro* v. *Viera*, 207 Conn. 420, 428, 541 A.2d 1216 (1988).

"Waiver is the intentional relinquishment of a known right. *Wadia Enterprises, Inc.* v. *Hirschfeld*, 224 Conn. 240, 251, 618 A.2d 506 (1992); *Olean* v. *Treglia*, 190 Conn. 756, 772, 463 A.2d 242 (1983); *Multiplastics, Inc.* v. *Arch Industries, Inc.*, 166 Conn. 280, 286, 348 A.2d 618 (1974); *Brauer* v. *Freccia*, 159 Conn. 289, 295, 268 A.2d 645 (1970). A waiver occurs, therefore, only if there is both knowledge of the existence of the right and intent to relinquish it. *Novella* v. *Hartford Accident & Indemnity Co.*, 163 Conn. 552, 562, 316 A.2d 394 (1972) . . . ." *Heyman Associates No. 1* v. *Insurance Co. of Pennsylvania*, 231 Conn. 756, 777, 653 A.2d 122 (1995).

" '[Waiver] involves the idea of assent, and assent is an act of understanding. . . . Intention to relinquish [must] appear, but acts and conduct inconsistent with intention [to assert a right] are sufficient.' " *Hendsey* v. *Southern New England Telephone Co.*, 128 Conn. 132, 135, 20 A.2d 722 (1941), quoting *Temple* v. *New Britain*, 127 Conn. 170, 173, 15 A.2d 318 (1940).

Recently in *Stewart* v. *Tunxis Service Center*, 237 Conn. 71, 676 A.2d 819 (1996), our Supreme Court addressed the nature of the 120 day time limit set out in § 31-300. In *Stewart*, our Supreme Court held that time limit was mandatory and not directory, and "that any lack of timeliness may be waived, either expressly or by conduct." Id., 76. The *Stewart* court stated that "[w]aiver does not have to be express, but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so." (Internal quotation marks omitted.) Id., 80–81. We have noted that "[a] late judgment has been characterized by our Supreme Court as voidable rather than void, and the lateness of a judgment, if not seasonably objected to, has been permitted to be waived by the conduct or consent of the parties. [*Waterman* v. *United Caribbean, Inc.*, 215 Conn. 688, 692, 577 A.2d 1047 (1990).] That consent need not be express but may be implied." *Building Supply Corp.* v. *Lawrence Brunoli, Inc.*, 40 Conn. App. 89, 97, 669 A.2d 620, cert. denied, 236 Conn. 920, 674 A.2d 1326 (1996).[9]

---

[9] It is instructive to observe that in a similar context one of the factual contents that has been held to validate a judgment voidable under General Statutes § 51-183b is where "the losing party has allowed the defective judgment to stand without objection for an unseasonable period of time and through inaction has enabled the winning party to claim implied consent to the delay that has occurred. See, e.g., *Gordon* v. *Feldman*, [164 Conn. 554, 556–57, 325 A.2d 247 (1973)]; *Borden* v. *Westport*, [112 Conn. 152, 154, 151 A. 512 (1930)]; *Cheshire Brass Co.* v. *Wilson*, [86 Conn. 551, 560, 86 A. 26 (1913)]." *Waterman* v. *United Carribean, Inc.*, supra, 215 Conn. 693.

Initially, we point out that the plaintiff did not at any time after the 120 day period had elapsed and before the issuance of the commissioner's decision on December 19, 1994, even inquire into or object to the tardiness of that decision. Moreover, after the decision was issued, the plaintiff moved for and was given an extension of time to file her reasons for appeal. Thereafter, on January 12, 1995, the plaintiff filed a "Motion to Open Record to Submit Additional Documentary Medical Evidence" with the commissioner in which she sought to open the record for the purpose of introducing additional medical reports for Sabshin, the treating physician, "concerning his referral [of the plaintiff] to Dr. Anthony Scialla and Dr. David Goodkind." It was her claim in that motion that the "additional medical reports" would "clearly show" that the bills of Scialla and Goodkind were the responsibility of the defendant. This motion is wholly inconsistent with the plaintiff's claim that she did not do anything that supported the defendant's claim of waiver. The plaintiff requested that the commissioner open the record to introduce this additional documentary evidence in the expectation that he would change one of his rulings in the December 19, 1994 decision that was adverse to her. This motion did not expressly or implicitly indicate that she was attacking, as she did later, the tardiness of the decision and it is devoid of any reference to § 31-300. Moreover, in support of the motion, she alleged therein that "the parties will not be *delayed or prejudiced*" by the opening of the record. (Emphasis added.)

In our discussion, we do not overlook the fact that the plaintiff was represented by counsel throughout the underlying proceedings. On April 12, 1995, the plaintiff filed a statement of reasons of appeal for overturning the commissioner's decision with the board. This statement maintained that the commissioner committed seven errors. None of the reasons stated, either

expressly or implicitly, reveals that the plaintiff was attacking the tardiness of the commissioner's decision or contains any reference to § 31-300.

Some months later on September 27, 1995, the plaintiff filed an amended statement of reasons of appeal in which for the first time she mentions the tardiness of the commissioner's decision as a ground for vacating his finding and award. The period from December 19, 1994, to September 27, 1995, is 280 days. Under the circumstances set out and given the application of the legal principles to which we have referred, we conclude that the plaintiff clearly waived by implication her right to have the December 19, 1994 decision of the commissioner vacated for lateness under § 31-300. Among those circumstances are her efforts to have the record opened to present additional evidence, her reasons for appeal filed April 12, 1995, containing several grounds for appeal, not one of which suggests a lateness issue, and her unreasonable assertion in a motion filed on September, 28, 1997, in which she first raises the lateness issue.

II

Next, the plaintiff claims that the board improperly affirmed the commissioner's finding that she was not totally disabled from her employment. She claims that the defendant failed to meet its burden of proof with respect to form 36 and that the evidence before the commissioner did not support a finding that she did not suffer a temporary total disability during the period when she received benefits. She also argues that the "[c]ommissioner based his decision on Dr. Arons' reaction to a short videotape prepared surreptitiously by the defendant."

In *Six* v. *Thomas O'Connor & Co.*, 235 Conn. 790, 798–99, 669 A.2d 1214 (1996), our Supreme Court said: "[T]he power and duty of determining the facts rests on the commissioner, the trier of facts. *Czeplicki* v.

*Fafnir Bearing Co.*, 137 Conn. 454, 457, 78 A.2d 339 (1951). The conclusions drawn by him from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or from an inference illegally or unreasonably drawn from them. *Mathurin* v. *Putnam*, 136 Conn. 361, 366, 71 A.2d 599 (1950). *Adzima* v. *UAC/Norden Division*, 177 Conn. 107, [118], 411 A.2d 924 (1979); *Murchison* v. *Skinner Precision Industries, Inc.*, 162 Conn. 142, 145, 291 A.2d 743 (1972)." (Internal quotation marks omitted.) See *Pagliarulo* v. *Bridgeport Machines, Inc.*, 20 Conn. App. 154, 157, 565 A.2d 8 (1989). This standard clearly applies to conflicting expert medical testimony. "It [is] the province of the commissioner to accept the evidence which impress[es] him as being credible and the more weighty." *Stankewicz* v. *Stanley Works*, 139 Conn. 215, 217, 92 A.2d 736 (1952); see *Winzler* v. *United Aircraft Corp.*, 132 Conn. 118, 120, 42 A.2d 655 (1945).

We point out that as early as January 7, 1985, Sabshin, the plaintiff's treating physician, approved of her returning to restricted work. In the spring of 1985, the plaintiff requested a letter from Sabshin "indicating total disability" and he refused to issue such a letter. The commissioner made a number of findings, as indicated earlier in this opinion, that the plaintiff's bilateral carpal tunnel syndrome was compensable and was the only neurological condition attributable to her employment, and that Werdiger came to this conclusion on the basis of his own findings and examination.[10] The plaintiff was examined and her condition evaluated by Arons, a specialist in hand surgery, on three occasions in 1988 and 1989. As part of his examination and evaluation process, Arons reviewed and summarized thirty-one

---

[10] As to this opinion of Werdiger, the commissioner specifically found: "A later review of reports from Dr. Sabshin; Dr. Goodkind; Dr. Scialla; Dr. Chiapetta; Martin DeSomma, D.C.; Dr. Feinglass; Marvin Arons, M.D.; Dr. Hutchinson and Dr. Hasbani confirmed Dr. Werdiger's conclusion."

reports of prior examinations and tests. He later gave his deposition, during which he was shown photographs and a videotape taken during the surveillance[11] of the plaintiff in 1989 and 1992. Arons' opinion is supportive of the commissioner's decision in this case. The commissioner's finding that the plaintiff was not totally disabled from her employment is supported by the evidence.

The decision of the compensation review board is affirmed.

In this opinion the other judges concurred.

---

[11] Workers' compensation benefits were being paid during the period covered by the surveillance. The defendant has paid the plaintiff weekly workers' compensation benefits through November, 1994.