STATE of Missouri ex rel. John
ASHCROFT, Appellant,

v.

Bruce A. WAHL, Don J. Elliott, and
Business Men's Venture,
Respondents.

No. WD 31362.

Missouri Court of Appeals,
Western District.

May 13, 1980.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 9, 1980.

Application to Transfer Denied
July 15, 1980.

John Ashcroft, Atty. Gen., William L. Newcomb, Jr., Asst. Atty. Gen., Jefferson City, David L. Forbes, Asst. Atty. Gen., Kansas City, for appellant.

Stephen W. Mendell, St. Joseph, for respondents; Dale, Flynn, Mendell & Barnes, St. Joseph, John J. Kitchin, Kansas City, of counsel.

Before PRITCHARD, P. J., and SWOFFORD and KENNEDY, JJ.

PRITCHARD, Presiding Judge.

This is a suit brought by appellant to enjoin the respondents' activities in the promotion of an alleged scheme for the solicitation of consumers to join a club called Business Men's Venture, said to be in violation of §§ 407.020 and 407.405, RSMo 1978. The dispositive question is whether respondents' activities contravene the provisions of § 407.405, called generally "Pyramid Sales Schemes."

Appellant alleged violations of § 407.020, which provides: "The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, · suppression or omission, in connection with the sale or advertisement of any merchandise, is declared to be an unlawful practice;". No evidence was presented to sustain any element within this statute as being an unlawful practice, and of course, as hereinafter set forth, there was no sale or advertisement of any merchandise in this case, and there was no evidence that any person was deceived by respondents or others. Appellant cites *State ex rel. Sanborn v. Koscot Interplanetary, Inc.*, 212 Kan. 668, 512 P.2d 416 (1973); and *Kugler v. Koscot Interplanetary, Inc.*, 120 N.J.Super. 216, 293 A.2d 682 (1972). In *Sanborn* defendants were charged with engaging in unlawful business practices under two statutes: § 50–602, K.S.A.1972, and § 50–603, K.S.A. 1972 (the latter being known as the provision against chain referral or pyramid sales scheme). § 50–602 is identical with § 407.-020, supra, except that the Missouri enactment lacks the last sentence of the Kansas enactment, " * * * whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." The New Jersey statute in *Kugler* likewise included the last sentence of the Kansas statute. § 407.020 is not applicable to the facts of this case.

Business Men's Venture (BMV) was never subject to the jurisdiction of the trial court. Its status as an entity, if so, was never explained, except that it is apparently a very loose organization of individual persons who are members of that association. The state by stipulation made in open court waived its right to proceed with criminal penalties against respondents Elliott and Wahl, and the state called them as its witnesses in the case.

Although there were two exhibits which were apparently the same as charts used by

BMV and its members referred to by witnesses in their testimony, unfortunately those exhibits were not introduced into evidence and are not before this court. The method of operation, the system and the plan of BMV must be gleaned from the testimony of witnesses without the benefit of the chart exhibits. Trial began October 18, 1979.

Elliott is a contractor in Independence, Missouri. He had known Wahl for 3 years. Elliott is familiar with BMV, Wahl having called him about it in mid-August (1979). Elliott explained that BMV was just a club with aims or goals to have a chance to make money. "A. If you got in you recruited two people and if everybody would recruit two people you could make money in it. No guarantees. When you got in, for dues, it cost five hundred dollars to get in to the person that brought you in, and the other five hundred goes to the person on the line across from you." Elliott was a record keeper for the people, taking care of charts and records for them. "Those were the charts of people that got in, they could see where their position was, how close they were to receiving money, to have a profit, and any time they wanted to see it, it was there for the people, we were secretaries for the people." As compensation, or a fee (to Elliott and Wahl), each person paid $500 when they had a profit; when they reached the seventh tier, "it was the first cashier's check they would give to us, if they wanted to, we didn't say you had to, it was their own choice."

The people rented an office at 3622–A Noland Court in Independence, Missouri, from landlord Dick Digby. Digby was paid by the people who agreed that if there was any rent due they would divide it up evenly and pay it. Some people contributed $20 to this expense, but some did not pay anything.

Elliott further explained: If a person wanted to get in, he would give the person with whom he dealt $500, and the other $500 would go to the person on the seventh tier, and by paying the money, the person would be entitled to a place on the chart, having a chance to make money, but no guarantees. If one on the seventh tier fulfilled all potentials, he would receive $64,-000, at which time he could get back in the venture (but not before that time) by reinvesting $1,000. When Elliott joined BMV he was underneath Wahl, about the third or fourth tier. Elliott did not receive benefits at the time of trial.

Bruce Wahl is a real estate salesman in Independence. He was contacted about BMV by his friend, Tom Haas, in early August (1979), and he eventually did join the club. He talked to some other people about the club "and under their own choice they did join it." Wahl was successful in getting two people in BMV, thus getting his money back. These two were Elliott and a Jim Springer. Wahl was the secretary for the club with duties of showing people where they were on the chart. For them to get their money back, they would have to bring two people in and show Wahl "what they had coordinated" and there was a chart there to show where they were. The chart was made upon a sheet of paper, with a person's first initial and last name. When an individual got into the club, he would bring two people in, and the chart would be updated in the center. Each chart has the possibility of "breeding" eight charts. "You can create eight charts out of one chart if people bring other people in * *. The charts will, you know, infinity where it would end, actually. Q. Infinity? A. Infinity, as far as the maintenance, as far as showing people where they are at." When one gets into the club: "Q. And I give you five hundred dollars, is that correct? A. Yes. Q. What am I paying for, what is this money for? A. That's so you can be a member of the club. Q. In other words, I have to pay you to get on the chart? A. Yes, because I had to pay someone else to get on the chart, it's—." At the time of trial, there were 300 to 400 members in the club, whose purpose was to make money, and which depended upon expansion of membership. Wahl testified that according to the newspapers, the BMV idea originated in Arkansas. At the time he joined it, there were nine persons in it, and through people

he got in, he was instrumental in achieving the point of being seven positions removed, although he was not successful in getting the chart filled beneath him. There were being kept and maintained about 60 charts at the Independence office.

The trial court asked Wahl this question: "All right. Now, does this person appear who gets to be 'A' get the sixty-four thousand dollars, that we've mentioned here, how does he get that, who keeps the money so he can get it? THE WITNESS: Okay. When 'A' brings in the two 'B's' those two 'B's' bring in four 'C's', the four 'C's' bring in eight 'D's', the eight 'D's' bring in sixteen 'E's', and the sixteen 'E's' bring in thirty-two 'F's'. Okay. And the thirty-two 'F's' bring in sixty-four 'G's', then the sixty-four 'G's' bring in a hundred and twenty-eight 'H's', then when you have a hundred and twenty-eight 'H's' who did the same thing that 'A' did, there's a hundred and twenty-eight five-hundred-dollar cashier's checks, you know, that possibly will go to 'A'. THE COURT: Who are these checks made to? THE WITNESS: They will be made to the person who is 'A', at that point, and it will never happen all at once, that would be, you know, just theory, possibly. THE COURT: I take it there's been certain pay-outs in this club activity? THE WITNESS: Yes, sir. THE COURT: Some people have been paid, is that right? THE WITNESS: Yes, Your Honor. THE COURT: You haven't gotten to the sixty-four thousand, I take it? THE WITNESS: No sir, not even close, Your Honor, because each person controls his own, and it vectors off and you can't control how it vectors, because the people bring in their people where they want them so— THE COURT: So at no time is the club ever endowed with money, it is always in the pockets of the people, is that it? THE WITNESS: Yes, Your Honor."

Wahl expounded further: "MR. KITCHIN: Your Honor, if I could ask him just one question? Q. (By Mr. Kitchin) You don't hold these cashier's checks until the sixty-four thousand or any set figure, as those come in, the people pay them, the ones down here at the bottom, 'A-sub 7', or whatever that writing is, he gives that to the one on the top seven levels above, immediately, because nothing accumulates, isn't that right? A. That is right. Like I said, we have never had any problem with disbursements, the people are there, within, you know, there's never a large amount of money or anything like that. THE COURT: Now, is this a perpetual motion thing, will it keep going, or do you have any idea? THE WITNESS: Now, not for the individual people, a person, when he is off of the chart, like suppose it veins off, they may receive two thousand dollars, say it's an active chart, they've got a real good person in, suppose 'A' got a 'B' in and 'B' was kind of a dud and just sat there, so 'A' might know someone else who was a real go-getter, so 'A' got in 'C'. Okay. 'C' is a real go-getter, he is just really working, so 'C', by filling his chart would only get 'A' sixteen cashier's checks, 'C' filling his down, 'A' would have three-quarters of his chart empty, if everything was based on 'C', the people 'C' brings in will not go under 'D', on the other side, because that would be just like, you know, throwing away 'C's' efforts. THE COURT: What about some of these folks down here at the bottom, is there a possibility they won't receive back their money? THE WITNESS: There is is a possibility only if they don't bring in their two people, bring in two people into the club, if they do not do that, then they would not receive their money back, and that is understood."

For defendants, Ivan Ireland (and others below) testified he became a member of BMV about September 10 (1979), being introduced by Ron Beck to whom he gave $500, and made a cashier's check to the person on the seventh tier, but that person was neither Elliott nor Wahl. Neither of these two made any promises to Ireland that there would be a guaranteed return. They were just keeping records of who were members. Ireland gave Beck $500 "To get a membership into the club", and got in return just an opportunity. He did not contribute anything for overhead expenses, nor was he solicited to do so because

he understood that the contributions for that purpose was when one got down to where he was making money. He got his $1,000 back, and made $500. He understood that when one gets to the seventh level, when the checks start coming in, the first one went to the record keepers for their services in keeping all the records, and all the rest received would be totally that person's. Ireland got down to the seventh level on just one name, and gave that $500 to Wahl and Elliott.

Cleo Elliott, Don Elliott's father, was brought into the club by him. Cleo brought in two people, recouped his $1,000, and they went under him on the charts, which position he decided. Cleo paid $100 out of his first cashier's check to Elliott and Wahl for administration expenses. No guarantees were given to Cleo.

Richard Digby was brought into BMV in September by Dick Lindsey to whom he gave $500 and who showed him the chart where Digby saw the name to whom he should make out a check. Wahl explained the club to Digby. Lindsey wanted Digby under his name for the purpose of working his name to the pay line. Digby was the landlord for the club, but he made no payments for administrative expenses, although he saw the coffee can placed for contributions on a desk he had loaned the club. When Digby paid his $500 to Lindsey, it was his understanding that what he would get in return was an opportunity to join the club and participate in the system—an opportunity to make some money. Wahl and Elliott made him no promises.

Michael McGhee joined the club through Ron Beck, to whom he gave $500, and he made a $500 check to the person on the seventh tier, who was neither Wahl nor Elliott. Michael saw his name put on the chart at the direction of Beck. He had not found two people (to recoup his $1,000) to the time of trial.

Sturgis Cumberford was introduced to the club by George Surprise, a doctor. He saw his name go on the chart directed by Dr. Surprise at Vee's restaurant. Sturgis found his own members, and he signed a form in evidence: "I understand that Business Men's Venture is not (underscored) the promotion or sale of goods or services, it has been explained to me that there are no guarantees and Mr. _____ (blank) is responsible for bringing me into this venture and I will have no complaint if I do not receive my money back."

In paragraphs 6, 7, 9 and 10 of the petition for injunction, appellant pleaded, "Defendants have transacted business and continue to transact business in and from the State of Missouri individually and through their servants, agents, employees or representatives by selling, offering for sale, attempting to sell, and promoting ventures and/or opportunities to receive pecuniary benefits. 7. Defendants have engaged in and are presently engaged in the practice of selling and promoting the sale of ventures and/or opportunities to receive pecuniary benefits. The scheme operates as follows: Defendants solicit and promote consumers to join their scheme. Consumer A pays one of the defendants $500 and pays another $500 to an unknown individual seven transactions removed from Consumer A. Consumer A then solicits two additional consumers (Consumers B and C) and the process is repeated. Consumers B and C then continue the process. Once 128 people have entered the above scheme, defendants (individually) will have received $64,000. Defendants also maintain the charts and graphs of such sales scheme in order that consumers can learn the identity of the individual seven transactions removed from them on the pyramid. * * * 9. The defendants individually or through their agents, servants, employees or representatives, in connection with the sale or in the offering for sale of ventures and/or opportunities to receive pecuniary benefits from the State of Missouri, have engaged in and are presently engaging in illegal, misleading, and deceptive merchandising practices in violation of Sec. 407.405 and Sec. 407.020, RSMo 1978, including but not limited to those specific acts or practices contained in Paragraph 7 above. 10. Each of the acts, methods or practices described in Para-

graph 7 above was done by defendants individually or by their agents, servants, employees or representatives intentionally with full knowledge of the illegality, lack of truth, or falsity of the representations made, to induce members of the general public to rely on same and purchase ventures and/or opportunities to receive pecuniary benefits from or through defendants. Members of the general public have relied on said false representations, had a right to rely, and by their reliance have unknowingly assisted defendants in the promotion of this illegal scheme as well as potentially suffering economic harm."

The trial court correctly concluded that respondents had not committed an act or used or employed any act of deception, fraud, false pretense, false promise, misrepresentation, nor had they concealed, suppressed, omitted any material fact with the intent that others rely upon such concealment, suppression, or omission in connection with the sale or advertisement of any merchandise as prohibited by § 407.020. The trial court concluded further that neither defendant Wahl nor defendant Elliott had directly or through the use of agents and intermediaries, in connection with the sale or distribution of goods, services, or other property sold, offered or attempted to sell a participation or the right to participate in a pyramid sales scheme as defined in § 407.-400(5), and prohibited by § 407.405. As below demonstrated, this conclusion was erroneous.

§ 407.400(5) provides: "The term 'pyramid sales scheme' includes any plan or operation for the sale or distribution of goods, services or other property wherein a person for a consideration acquires the opportunity to receive a pecuniary benefit, which is not primarily contingent on the volume or quantity of goods, services, or other property sold or distributed or to be sold or distributed to persons for purposes of resale to consumers, and is based upon the inducement of additional persons, by himself or others, regardless of number, to participate in the same plan or operation; * * *."

The pertinent portions of the prohibitory § 407.405 provides: "No person shall, directly or through the use of agents or intermediaries, in connection with the sale or distribution of goods, services, or other property, sell, offer or attempt to sell a participation or the right to participate in a pyramid sales scheme. * * *."

Respondents contend that the statute (§ 407.405) is penal in nature and must be strictly construed as to its application, especially the definition terms of § 407.-400(5). Although § 407.410 provides for double damages to a person induced or caused to enter a pyramid scheme on a contract made in violation of § 407.405, no person is in this case claiming such damage. And although § 407.420 provides that a wilful violation of § 407.405 shall constitute a felony, any possibility of a criminal charge has been abandoned by the state pursuant to its open-court stipulation. These penal attributes of Chapter 407 are thus not in this case, and the only thing here is the remedial aspects of the chapter existent by reason of the alternative injunctive relief afforded by reason of § 407.100 and § 407.415. It thus appears that what the state is seeking is the remedial remedies of the chapter, and not the penal portions. In *Collier v. Roth*, 468 S.W.2d 57, 60 (Mo. App.1971), it was said, "Where a statute is remedial in one part and penal in another, it should be considered as penal when enforcement of the penalty is sought." See also *City of St. Louis v. Carpenter*, 341 S.W.2d 786, 788[3, 4] (Mo.1961), where it is said (conversely), "[a statute] should be considered a remedial statute when enforcement of the remedy is sought and penal when enforcement of the penalty is sought." In *Carpenter*, page 788[1], it is said further, "Statutes enacted for the protection of life and property, or which introduce some new regulation conducive to the public good, are considered remedial in nature and are generally given a liberal construction. [Citing authority and cases.]" The latter quote in *Carpenter* applies to this case. Obviously, the injunctive remedy sought here is remedial; the Legislature has sought to remedy iniquitous merchan-

dising practices by Chapter 407, which is for the protection of property and conducive to the public good, by providing for injunctive relief. See also *State ex rel. Terminal R.R. Ass'n of St. Louis v. Hughes*, 350 Mo. 869, 169 S.W.2d 328 (1943).

 the intent of the Legislature in enacting § 407.400 and § 407.405, must n..vertheless be ascertained, but in so doing the words used by it must be given a liberal interpretation under the above cases, in order to arrive at the objectives of the Legislature, so that the intent may be found "from the words used, if possible; ascribing to the language used its plain and rational meaning and giving significance and effect to every word, phrase, sentence and part thereof, if in keeping with that intent." *State ex rel. Jones v. Ralston Purina Company*, 343 S.W.2d 631, 638[3, 4] (Mo.App. 1961), and case cited. The general intent of the Legislature in enacting the subject statutes is obviously to buttress a strong public policy against pyramid sales schemes, as evidenced by the multiplicity of remedies provided; and the statutory language is designed to encompass schemes involving a cover or disguise of some ostensible legitimate commercial transaction.

Respondents argue that BMV memberships are not "goods, services or other property" and do not, therefore, fall within statutory definitions. The term "goods" is defined in § 407.400(2) as including any personal property, real property, or any combination thereof. "Services" is not defined. But what respondents must be found to be dealing in, under the evidence, is "other property", defined in § 407.400(3) as including "a franchise, license distributorship, *or other similar right, privilege, or interest* ;". [Italics added.] Clearly, a consideration passed between a person soliciting another to join the club—the payment of $500 each to two persons by the joiner in return for the "right or privilege" to be a member, and have the chance for pecuniary gain, "to make money" as all witnesses indicated.

 Respondents argue that even if appellant's position is correct that the sale of memberships in BMV constitutes "other property" as defined, yet the statute cannot apply to them because the operation *is* "contingent on the volume or quantity of goods, services, or other property (the volume or quantity of BMV memberships) sold or distributed or to be sold or distributed to persons for purposes of resale to consumers." It is contended that the quoted phrase constitutes an exemption to respondents. The argument must fail because what is *sold* is a place on the BMV chart, with the opportunity to move up to the top payoff position which could be attained by the inducement of additional persons, "by himself or others, regardless of number, to participate in the same plan or operation." That place on the chart is never resold. What is intended by the exemption is that the property sold be tangible personal property which is to be resold to consumers, and thus be exhausted and a BMV membership cannot constitute that kind of property because the place on the chart initially sold is not resold and thus removed from the chart. What is sold are two new places on the chart by a member and subsequent arithmetic progression of such places so as to complete a chart by an ultimate 128 new members who pay to the top member seven tiers above them $500 each so that the top member may, or will, receive the ultimate benefit of $64,000 gross profit.

 In this scheme there is a logical conclusion that there would be many members at the bottom tiers of each chart who would not stand any chance to achieve a top payoff position—and this would be certainly true if the number of persons reached "infinity" as termed by respondent Wahl. The pyramidal nature of BMV is clearly shown by the evidence, and it is equally clear that respondents had been, and were at the time of trial, engaged in fostering the venture. The mere fact that no deception or misrepresentation was indulged by either respondent is immaterial as those are not elements of § 407.405.

 The trial court found that neither defendant was then engaged in a pyramid

sales scheme. Although it is true that there is no evidence that either was then soliciting new memberships in BMV, it is equally true that they continued to participate in the scheme. Both were record keepers, showing new members where their names were positioned on the charts, and pointing out who the top person was and where the $500 cashier's check due him was to be sent. And also, although neither respondent had then received the gross $64,000, they were in a potential spot to do so, and upon doing so, they were free to join another pyramid group. Respondents say that the evidence of these activities was beyond the pleadings. The pleadings, however, may be deemed amended, Rule 55.33(b), to conform to the proof, there being no objection to the evidence of respondents' activities in BMV at the time of trial. That evidence showed that respondents then maintained membership charts, secured office space from members' voluntary payments, manned the office, held themselves available to speak to prospective and new members about the club and directions about its operation, and when in the profit-taking position, stood then to gain by receipt of $500 from each new member joining and paying to them the $500 membership fee after this trial.

Respondents are in violation of § 407.405. Under the provisions of § 407.100, an injunction lies to prohibit them from continuing any method, act, or practice or engaging therein or doing anything in furtherance thereof.

The judgment is reversed and the case is remanded with directions to enter a permanent injunction against respondents prohibiting them from: (1) maintaining membership charts for BMV; (2) advising or explaining BMV's operation to any persons joining or intending to join it; (3) maintaining or manning any office for BMV; (4) receiving any monies from new or prospective members whatsoever, or by reason of attaining the seventh tier above such members, or by reason of a member achieving the top tier and paying respondents monies for their services; and (5) doing any act in furtherance of BMV. Further proceedings should be had to determine the necessity of

appointing a receiver under the provisions of § 407.100 and § 407.105.

All concur.