UNITED PHARMACAL COMPANY
OF MISSOURI, INC.,
Appellant,

v.

MISSOURI BOARD OF PHARMACY,
Respondent.

No. SC 87316.

Supreme Court of Missouri,
En Banc.

Dec. 19, 2006.

R. Dan Boulware, R. Todd Ehlert, Sharon Kennedy, St. Joseph, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Sharon K. Euler, Asst. Atty. Gen., Kansas City, for Respondent.

MICHAEL A. WOLFF, Chief Justice.

Is the retail sale of veterinary drugs the "practice of pharmacy" regulated by the state board of pharmacy?

The state board of pharmacy administers and enforces the statutes and regulations relating to licensing and regulation of pharmacists and pharmacies. Sections 338.110 and 338.140.[1] United Pharmacal Company of Missouri is a retail store that sells animal feeds and products.

For about 20 years, United Pharmacal has also sold federal legend drugs—i.e., prescription drugs—to consumers who

---

1. Unless otherwise noted, all references are to RSMo 2000.

have prescriptions from veterinarians for treatment of their animals. United Pharmacal does not sell or dispense drugs for human use. The company has engaged in this practice without a license from the pharmacy board and does not employ a licensed pharmacist.

In 1994 and 1997, the pharmacy board investigated United Pharmacal for selling animal legend drugs without a pharmacy license, each time taking no action. In 2000, however, a board staff member undertook a third investigation of United Pharmacal. The staff member concluded that this conduct is the practice of pharmacy, in violation of the Missouri Pharmacy Practices Act, chapter 338.

Based on this investigation, the pharmacy board issued a "Cease and Desist Warning" letter to United Pharmacal, declaring that the company's practices constituted the "practice of pharmacy" without a license in violation of sections 338.010.1 and 338.220. The letter ordered United Pharmacal to stop selling animal legend drugs to consumers without a pharmacy license and informed the company that violating the Act also constituted a crime.

In response, United Pharmacal filed a declaratory judgment action in the circuit court of Buchanan County seeking a declaration that the pharmacy board engaged in improper rulemaking and that the pharmacy board did not have authority to regulate United Pharmacal's activity. This Court held that venue was improper in Buchanan County, vacated the trial court's judgment, and remanded the case for transfer to the Cole County Circuit Court. *United Pharmacal Company of Missouri, Inc. v. Missouri Board of Pharmacy,* 159 S.W.3d 361, 363 (Mo. banc 2005).

On remand, United Pharmacal amended its petition requesting a declaration that the Act does not grant the pharmacy board the authority to regulate the retail sale of veterinary prescription drugs. United Pharmacal also argued that, if the circuit court determined the act regulated this activity, it would be unconstitutionally vague. United Pharmacal moved for summary judgment. The circuit court denied the motion and entered judgment, holding that the sale of veterinary legend drugs is within the pharmacy board's regulatory powers because it is "the practice of pharmacy." United Pharmacal appeals.

Because this action involves the validity of a statute, this Court has exclusive appellate jurisdiction. Mo. Const. art. V, section 3.

## Does the Pharmacy Act Cover Veterinary Drugs?

 United Pharmacal presents two arguments on appeal: first, that the circuit court erred in holding that the retail sale of veterinary prescription drugs used for treating animals constitutes "the practice of pharmacy" under the Act; and, second, that the Act, as construed by the circuit court, violates due process because it is unconstitutionally vague and it fails to inform persons of ordinary intelligence that the retail sale of veterinary prescriptions drugs to consumers for use in animals is the "practice of pharmacy." This Court reviews this question of law *de novo. Smith v. Shaw,* 159 S.W.3d 830, 832 (Mo. banc 2005).

This controversy can be resolved by reading the statute. It is unnecessary to reach United Pharmacal's constitutional challenge.

 The statutory language guides this Court's analysis. The goal of statutory analysis is to ascertain the intent of the legislature, as expressed in the words of the statute. *American Healthcare Management, Inc. v. Director of Revenue,* 984

S.W.2d 496, 498 (Mo. banc 1999) (*citing Hyde Park Housing Partnership v. Director of Revenue*, 850 S.W.2d 82, 84 (Mo. banc 1993)). This goal is achieved by giving the language used its plain and ordinary meaning. *Id.* When the legislative intent cannot be determined from the plain meaning of the statutory language, rules of statutory construction may be applied to resolve any ambiguity. *Bosworth v. Sewell*, 918 S.W.2d 773, 777 (Mo. banc 1996).

### The Statutes

Section 338.010, defining the "practice of pharmacy," provides in relevant part:

1. The **"practice of pharmacy"** shall mean the interpretation and evaluation of prescription orders; *the compounding, dispensing and labeling of drugs and devices pursuant to prescription orders;* the participation in drug selection according to state law and participation in drug utilization reviews; the proper and safe storage of drugs and devices and the maintenance of proper records thereof; *consultation with patients and other health care practitioners about the safe and effective use of drugs and devices;* and the offering or performing of those acts, services, operations, or transactions necessary in the conduct, operation, management and control of a pharmacy. No person shall engage in the practice of pharmacy unless he is licensed under the provisions of this chapter.... *This chapter shall also not be construed to prohibit or interfere with any legally registered practitioner of medicine, dentistry, podiatry, or veterinary medicine, or the practice of optometry* in accordance with and as provided in sections 195.070 and 336.220, RSMo, in the compounding or dispensing of his own prescriptions. (Emphasis added).

Section 338.210, defining "pharmacy," is also relevant to this Court's analysis. It provides in part:

1. Pharmacy refers to any location where the practice of pharmacy occurs or such activities are offered or provided by a pharmacist or another acting under the supervision and authority of a pharmacist, including every premises or other place:

 (1) Where the practice of pharmacy is offered or conducted;

 (2) Where drugs, chemicals, medicines, prescriptions, or poisons are compounded, prepared, dispensed or sold or offered for sale at retail;

 (3) Where the words "pharmacist", "apothecary", "drugstore", "drugs", and any other symbols, words or phrases of similar meaning or understanding are used in any form to advertise retail products or services;

 (4) Where patient records or other information is maintained for the purpose of engaging or offering to engage in the practice of pharmacy or to comply with any relevant laws regulating the acquisition, possession, handling, transfer, sale or destruction of drugs, chemicals, medicines, prescriptions or poisons.

. . . . .

The pharmacy board asserts that United Pharmacal's sale of veterinary legend drugs constitutes "the dispensing" of drugs that require a prescription and, therefore, is the "practice of pharmacy" under section 338.010. Under the board's analysis, United Pharmacal would also qualify as a pharmacy under section 338.210. The board argues that section 338.010 applies to any entity that dispenses prescription drugs, and since the statute

does not specifically exempt the sale of veterinary drugs, United Pharmacal's activity is regulated under the Act.

United Pharmacal maintains that its activity is not regulated because the Act does not expressly empower the pharmacy board to regulate the sale of drugs for *animal* use pursuant to *veterinary* prescriptions. United Pharmacal relies on section 338.010's inclusion of "consultation with patients and other health care practitioners" as the practice of pharmacy, arguing that this demonstrates a legislative intent to limit the Act's scope to drugs dispensed for human use. United Pharmacal bolsters its argument by pointing to other portions of the Act, specifically to section 338.220, which contains a list of eleven classifications for pharmacy licenses, none of which applies to persons or businesses engaged in the retail sale of veterinary drugs.[2]

These arguments highlight the statute's ambiguity. Both parties' arguments are supported by parts of section 338.010. For example, section 338.010 can be construed broadly, as the pharmacy board suggests, to encompass the sale of all prescription drugs because it does not exempt veterinary drugs. Because "drug" is not defined in the statute, its meaning is ascertained from the dictionary definition. One definition of "drug" is "a substance intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animal." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993). This definition supports the board's contention that veterinary drugs are within the Act.

Despite this definition, the statute does not expressly state that veterinary drugs are covered under the statute. There is no express language giving the pharmacy board authority to regulate United Pharmacal's activity. Internal ambiguity also results from section 338.010's reference to "consultation with patients" as the "practice of pharmacy." This language appears to limit the scope of the statute to human patients, notably because of the "consultation" language and based on the dictionary definition of "patient"—"a sick individual esp. when awaiting or under the care and treatment of a physician or surgeon," or "a client for medical service (as of a physician or dentist)." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1993). This definition of "patient" suggests that the statute is limited to drugs dispensed for human use.

Section 338.010 creates further ambiguity by providing an exception from regulation under chapter 338 for veterinarians dispensing their own medications. This provision is unnecessary if the statute does not cover veterinary drugs. In summary, section 338.010's ambiguity is evident—the definition of "drugs" supports the board's position but the definition of "patient" supports United Pharmacal's position. Legislative intent on this issue cannot be discerned from section 338.010's plain language.

■ Because the plain language does not answer this question, this Court must turn to recognized principles of statutory construction. To discern legislative intent,

**2.** 1 . . . . . The following classes of pharmacy permits or licenses are hereby established:
(1) Class A: Community/ambulatory;
(2) Class B: Hospital outpatient pharmacy;
(3) Class C: Long-term care;
(4) Class D: Nonsterile compounding;
(5) Class E: Radio pharmaceutical;
(6) Class F: Renal dialysis;
(7) Class G: Medical gas;
(8) Class H: Sterile product compounding;
(9) Class I: Consultant services;
(10) Class J: Shared service;
(11) Class K: Internet.

"the Court may review the earlier versions of the law, or examine the whole act to discern its evident purpose, or consider the problem that the statute was enacted to remedy." *In re M.D.R.*, 124 S.W.3d 469, 472 (Mo. banc 2004); *See also State ex rel. Nixon v. QuikTrip Corp.*, 133 S.W.3d 33, 37 (Mo. banc 2004). "Statutory construction should not be hyper technical but instead should be reasonable, logical, and should give meaning to the statutes." *In re Boland*, 155 S.W.3d 65, 67 (Mo. banc 2005).

A review of the Act provides little clarity. Nowhere does chapter 388 discuss the retail sale of veterinary prescription drugs. The Act does not define "drugs" or "patients." Nor does it indicate whether the act applies to prescriptions written for *all* drugs, or just those prescription drugs intended for use in humans. Neither does section 330.210, defining "pharmacy," provide any clear intent that the sale of veterinary legend drugs is governed by the Act. The section listing classifications for pharmacy licenses does not include a license for the dispensing of veterinary drugs. The pharmacy board's authority to regulate United Pharmacal can be inferred from some of the Act's language, but it is not explicit.

This Court declines to infer, or read into the statute, a legislative intent to regulate veterinary prescriptions, when it is not clear from the act.

The cases suggest it may be helpful to look to the agency's interpretation of the statute it enforces. *See, e.g., Morton v. Missouri Air Conservation Com'n*, 944 S.W.2d 231, 236–237 (Mo.App.1997). But to what interpretation should this Court defer? The board apparently concluded, after two previous investigations, that United Pharmacal was not engaged in the practice of pharmacy. The board was aware of United Pharmacal's practice for nearly ten years, yet took no action to regulate this practice. At the time the board sent its "Cease and Desist" letter, there had been no intervening statutory change altering the board's scope of authority. The board has not articulated why it has changed its statutory interpretation.

■ The board does not have the power to broaden the scope of its statutory authority. *Soars v. Soars–Lovelace, Inc.*, 346 Mo. 710, 142 S.W.2d 866, 871 (1940). As a regulatory body, the board regularly deals with the general assembly. For many years, the board left the regulation of veterinary pharmacies out of the board's duties, and there was no legislative response. There is no reason for this Court to defer to the board's recent change in statutory interpretation.

The board also argues that this Court should look to chapters 196 and 195 for guidance. Chapter 196, the Food, Drug and Cosmetic Act, contains provisions to protect the public by ensuring that drugs are accurately labeled and pure. Chapter 195, the Comprehensive Drug Control Act of 1989, regulates dispensing certain controlled substances. Both of these chapters define "drug" as including substances or articles used by both humans and animals. Sections 196.010(5) and 195.010(14). The board argues that these statutes should be read *in pari material* with chapter 338 so as to include within its scope those drugs sold for animal use. This argument is unpersuasive largely because both chapters 196 and 195 expressly encompass drugs for animal use. Their intent to regulate drugs for animal use is clear. The Missouri Pharmacy Practices Act does not expressly regulate veterinary drugs. Had the general assembly intended to grant the pharmacy board the authority to regulate the dispensing of animal drugs, it could

have done so expressly, just as it did in chapters 195 and 196.

 The decision not to include the sale of veterinary drugs as the practice of pharmacy is a policy decision for the general assembly. "[A]dministrative agencies— legislative creations—possess only those powers expressly conferred or necessarily implied by statute." *Bodenhausen v. Missouri Bd. of Registration for Healing Arts*, 900 S.W.2d 621, 622 (Mo. banc 1995). Because it is uncertain that United Pharmacal's activity is regulated under chapter 338, it is equally uncertain that the pharmacy board could legally issue United Pharmacal a license and regulate that license.[3]

 Because there is a possibility that United Pharmacal could face a criminal penalty, this Court will apply the rule of lenity. The rule of lenity dictates that ambiguity in a criminal statute must be resolved against the government. *Goings v. Missouri Department of Corrections*, 6 S.W.3d 906, 908 (Mo. banc 1999); *State v. Harper*, 855 S.W.2d 474, 479 (Mo.App. 1993); *Fainter v. State*, 174 S.W.3d 718, 721 (Mo.App.2005). Traditionally, this rule applies to statutes defining criminal behavior and providing for sentencing. *State v. Jones*, 899 S.W.2d 126, 127 (Mo. App.1995); *State v. Rowe*, 63 S.W.3d 647, 650 (Mo. banc 2002); *Woods v. State*, 176 S.W.3d 711, 712–713 (Mo. banc.2005). The rule, however, is applicable where violation of a civil statute has penal consequences. *J.S. v. Beaird*, 28 S.W.3d 875, 877 (Mo. banc 2000); *See also, City of Kansas City v. Tyson*, 169 S.W.3d 927 (Mo.App.2005). Section 338.195 provides that failing to comply with chapter 338 is a class C felony. Under the rule of lenity, the statute should be construed so that the sale of

veterinary drugs is not considered the "practice of pharmacy" and subject to the criminal sanctions of section 338.195.

## Conclusion

The "practice of pharmacy" statute cannot be read to cover the retail sale of veterinary prescription drugs used for treating animals. Because this issue is dispositive, the Court does not reach United Pharmacal's contention that the provisions of the pharmacy practices act are unconstitutional. The judgment of the circuit court is reversed.

PRICE, TEITELMAN, LIMBAUGH, RUSSELL and WHITE, JJ., concur.

LAURA DENVIR STITH, J., concurs in result in separate opinion filed.

**LAURA DENVIR STITH, Judge, concurring.**

I concur in the principal opinion's determination that those engaged in the retail sale of veterinary drugs are not subject to regulation by the board of pharmacy under chapter 338, RSMo 2000. I write separately to disagree with the principal opinion's determination that it should reach this result in part by application of the "rule of lenity." While the principal opinion is correct that the rule of lenity is applied in interpreting ambiguous criminal statutes, here we are asked in a declaratory judgment action to determine generally whether an administrative agency has authority to regulate the dispensing of veterinary drugs at retail, not specifically whether someone can be held to account under a criminal or penal statute. In this circumstance, the analysis of whether the pharmacy act applies to a particular party should be determined by application of the rules of construction normally applied to

---

**3.** *See* section 338.050, a license applicant must qualify under sections 338.010 and 338.020 in order for the board to issue a license.

statutes that contain both remedial and penal provisions. The analysis in this case need not be complicated by applying a rule of construction intended for criminal cases to this declaratory judgment context.

## DISCUSSION:

The rule of lenity "gives a criminal defendant the benefit of a lesser penalty where there is an ambiguity in the statute allowing for more than one interpretation." *Woods v. State*, 176 S.W.3d 711, 712 (Mo. banc 2005). It is a rule of mercy that, until recently, had been applied exclusively in criminal cases. A search in the Missouri cases database on Westlaw for the term "lenity" reveals thirty-two cases invoking the rule of lenity.[1] All but two of these cases involve criminal defendants urging that a criminal statute is ambiguous and the defendant therefore is entitled to the more lenient interpretation. The two exceptions are *J.S. v. Beaird*, 28 S.W.3d 875 (Mo. banc 2000), and *City of Kansas City v. Tyson*, 169 S.W.3d 927, 929 (Mo. App. W.D.2005), which expressly followed *J.S. v. Beaird*.

In all other civil cases involving statutes containing both remedial and penal provisions, this Court has applied the rule of construction that, "[w]here a statute is both remedial and penal, remedial in one part while penal in another, it should be considered a remedial statute when enforcement of the remedy is sought and penal when enforcement of the penalty is sought." *City of St. Louis v. Carpenter*, 341 S.W.2d 786, 788 (Mo.1961) (construing civil statute broadly where only remedial provisions were implicated). Remedial statutes are interpreted liberally to give broad meaning to their remedial purpose. *See Abrams v. Ohio Pacific Express*, 819 S.W.2d 338, 341 (Mo. banc 1991). Statutes

of a penal nature, on the other hand, "are always strictly construed, and can be given no broader application than is warranted by [their] plain and unambiguous terms." *City of Charleston ex rel. Brady v. McCutcheon*, 360 Mo. 157, 227 S.W.2d 736, 738 (banc 1950).

The court of appeals has followed this rule of statutory interpretation fairly closely. *See Kansas City Star Co. v. Shields*, 771 S.W.2d 101, 104 (Mo.App. W.D.1989) (holding that one sub-section of a statute is penal because it imposes a fine, but "the other portions of the statute ... are to be liberally construed"); *Structo Corp. v. Leverage Inv. Enterprises, Ltd.*, 613 S.W.2d 197, 202 n. 2 (Mo.App. W.D.1981) ("When the remedial part of a statute, also penal in other aspects, is the subject of enforcement, it is considered remedial for the purposes of decision"); *State ex rel. Ashcroft v. Wahl*, 600 S.W.2d 175, 180 (Mo.App. W.D.1980) (refusing to construe a civil statute that contained penalty provisions strictly against the state because "any possibility of a criminal charge ha[d] been abandoned by the state" and therefore the "penal attributes of [the statute] are ... not in this case").

While the practical effect of strict construction of a penal statute normally would be the same as would application of the rule of lenity, Missouri courts interpreting remedial statutes never utilized the rule of lenity in a case involving a statute that contained both civil remedial and penal provisions until *J.S. v. Beaird*, 28 S.W.3d 875 (Mo. banc 2000). In that case, a citizen convicted of a sex offense sought injunctive and declaratory relief from the sexually violent predator statute's registration requirement. This Court employed a

---

1. A search in the Missouri cases database on Westlaw for the term "lenity" yields 38 results. The oldest six of those cases (three of which are from the 19th century) use the term "lenity" in the opinion, but not as a term of art in reference to the rule of lenity.

contextual reading of the statute to conclude that its requirement of registration upon "coming into any county" did not apply to individuals whose county of residence did not change. *Id.* at 876–77. The Court also noted that the rule of lenity "reinforced" its "contextual reading" because, although "the requirement of registration is not necessarily punitive, sections 589.400 to 589.425 penalize a failure to register as a class A misdemeanor and subsequent offenses as a class D felony." *Id.* at 877.

The Court in *J.S.* acknowledged (at least implicitly) that the statute had both remedial and penal provisions, but it neither expressly relied on those distinctions to reach its conclusion, nor mention the fact that it was the first to use the rule of lenity to interpret a civil statute in a declaratory judgment action. Similarly here, the principal opinion does not acknowledge the distinctions between the remedial and penal provisions of the pharmacy statute, employing instead the rule of lenity.

*J.S.* is also unusual in that it is apparently only the third of this Court's cases to seek a declaratory judgment regarding the scope and application of a civil regulatory act that contains both remedial and penal provisions. The two prior cases to do so are *City of St. Louis v. Carpenter,* 341 S.W.2d 786, 788 (Mo.1961), and *Borden Co. v. Thomason,* 353 S.W.2d 735, 753 (Mo. banc 1962). According to *Carpenter,* the statute before it was remedial in effect; thus, it was construed liberally. 341 S.W.2d at 788 ("coverage of the law . . . is remedial and should be liberally construed"). By contrast, in *Borden,* despite the presence of penalty provisions that included treble damages, this Court broad-

ly construed the statute because it "contains no criminal penalties and is not a criminal statute, and is not required to be strictly construed against the State." *Borden,* 353 S.W.2d at 755. Although *J.S.* did not expressly overrule *Borden's* or *Carpenter's* use of a broad construction in a declaratory judgment action, by borrowing the rule of lenity from the criminal context to interpret a statute with both remedial and penal provisions, it implicitly rejected the conclusion in those cases that statutes with both penal and remedial provisions should be broadly or liberally construed.

This Court in both *J.S.* and this case could have reached the same result in reliance on the traditional method of analyzing a civil statute, set out above, without borrowing the rule of lenity from the criminal law. Where, as here, the Court interprets the reach of a civil statute that provides penal sanctions for noncompliance, it is appropriate to employ strict construction to limit its scope to only those persons or entities that are clearly regulated by the statute's literal meaning. If the scope of such statutes were given a broad construction, then a class of persons who reasonably believed that they were not required to comply with the statute could unexpectedly be at risk of punitive sanctions for noncompliance,[2] which would be inconsistent with prior Missouri cases construing penal statutes strictly according to their terms.

In sum, as this case does not involve an immediate threat of criminal sanctions, but merely seeks a declaration whether a particular class of person or entity is subject to regulation under the pharmacy act, reliance on the rule of lenity is misplaced. It would be more appropriate to hold that, in

---

**2.** As a criminal violation would require proof of a knowing violation, and as it would be difficult to prove knowing violation of a statute never before held to apply to a particular class of persons, the likelihood of imposition of criminal sanctions is small, but nonetheless would be an additional potential risk of a broad interpretation.

a context such as this, the statute will be given a narrow construction.

For these reasons, I concur in the result.