

# In the
# Missouri Court of Appeals
# Western District

| | |
|---|---|
| IN THE MATTER OF THE PETITION OF MISSOURI-AMERICAN WATER COMPANY FOR APPROVAL TO CHANGE ITS INFRASTRUCTURE SYSTEM REPLACEMENT SURCHARGE (ISRS), and MISSOURI PUBLIC SERVICE COMMISSION, <br><br> Respondents, <br><br> v. <br><br> OFFICE OF PUBLIC COUNSEL, <br><br> Appellant. | WD78792 <br><br> OPINION FILED: March 8, 2016 |

### Appeal from the Public Service Commission

Before Division One: Lisa White Hardwick, Presiding Judge, Victor C. Howard, Judge and Gary D. Witt, Judge

The Office of Public Counsel ("OPC") appeals the Missouri Public Service Commission's ("Commission" or "PSC") order approving the petition of Missouri-American Water Company ("MAWC") to change its "Infrastructure System Replacement Surcharge" ("ISRS"). The OPC contends that the Commission's order was unlawful because it approved an ISRS for St. Louis County ("County") even though the County

lacked one million inhabitants at the time of the last census, as is required by the ISRS statute. The OPC further argues that the Commission's order was unlawful because it set an ISRS recovery above the ten-percent limit set by the ISRS statute. We reverse and remand.

### Factual and Procedural Background

In 2003, the Missouri Legislature enacted legislation to create an ISRS giving water corporations a method, outside of a formal rate case, to charge additional customer rates to recoup the cost of infrastructure improvements. §§393.1000-393.1006.[1] It is undisputed that MAWC is a "water corporation," a "sewer corporation," and a "public utility" as those terms are defined in §386.020. It is further undisputed that MAWC is subject to the jurisdiction and supervision of the Commission.[2]

On February 27, 2015, pursuant to the ISRS statutes, MAWC filed an application with the Commission to increase its ISRS ("Petition"). The Petition sought rate recovery for costs incurred replacing infrastructure in St. Louis County for the period October 1, 2014, through January, 2015. The ISRS was established effective September 25, 2012, and had been changed effective June 21, 2013, December 14, 2013, May 30, 2014, and December 31, 2014. The Petition stated that MAWC was entitled to an additional $1,919,991 in revenue to be produced by the ISRS.

The Staff of the Public Service Commission ("Staff") filed a Recommendation to Reject Tariff and Proposed Increase to the Infrastructure Replacement Charge. The Staff

---

[1] All statutory references are to RSMo 2000 cumulative as currently supplemented unless otherwise noted.
[2] Both MWAC and the Commission filed briefs as respondents. Because they raise substantially similar arguments and, ultimately, it is the interests of MWAC which are being adjudicated, we will attribute arguments raised by both MWAC and the Commission to MWAC.

contended that the Petition impermissibly asked the Commission to provide for recovery of ISRS costs in excess of the ten-percent cap established by §393.1003.1.

The undisputed base level of revenue approved by the Commission in MAWC's most recent general rate proceeding was $258,926,618, which sets the ten-percent revenue cap for MAWC's ISRS at $25,892,662. The Commission provided for the annual recovery, in four prior ISRS cases, of up to $25,637,873. But, because the billing determinates set in MAWC's previous general rate case forecast more customer usage than actually occurred, the ISRS produced less revenue than was anticipated. As of September, 2014, despite providing for up to $25.6 million in revenue, MAWC's ISRS actually produced only $23,972,670 or $1,665,203 less than the maximum recovery. MAWC's Petition sought to carry forward this $1.6 million deficit and combine it with $254,789 in new ISRS expenditures, to set rate recovery at $27,557,864.

The OPC contended that this carry forward method results in an ISRS above the ten-percent statutory cap and is thus unlawful. In an effort to comply with the statutory cap but also grant MAWC full recovery, the Commission ordered the ISRS rate be set to recover the full $27,557,864 but "no later than 60 days before MAWC expects to reach the maximum revenue amount of $25,892,662, MAWC must file a new tariff designed to discontinue all ISRS charges associated with the revenues resulting from this order." By this, the Commission sought to allow MAWC to fully recover the entire ten-percent maximum allowed under the statute and reduce the risk that it would have another ISRS that did not fully recover funds. In effect, the Commission sought to take into account

3

the disparity between projected usage as determined by MAWC's last rate case and actual usage shown by the lack of recovery in its last ISRS by front loading the ISRS recovery.

On motion for rehearing, OPC brought two issues before the Commission. In the first, OPC contended that, as of the effective date of the results of the 2010 U.S. Census, St. Louis County did not meet the population requirements established for application of the ISRS statutes. As such, the Commission lacked authority to grant the relief MAWC requested. Second, OPC contended that the inclusion of the prior deficit to set recovery amounts resulted in rates that were impermissibly above the ten-percent cap provided for by the statute. The Commission found in favor of MAWC on both issues. This appeal followed.

## Standard of Review

"Appellate review of PSC decisions and orders is governed by section 386.510." *In re KCP&L Greater Mo. Operations Co.*, 408 S.W.3d 175, 182 (Mo. App. W.D. 2013).

> [R]eview of a PSC order is two-pronged: first, to determine whether the PSC's order is lawful; and second, to determine whether the PSC's order is reasonable. The appellant bears the burden of proof to demonstrate that the PSC's order is unlawful or unreasonable. The lawfulness of the PSC's order is determined by whether statutory authority for its issuance exists, and all legal issues are reviewed *de novo*. This Court need not reach the issue of the reasonableness of the PSC's order if it finds the order unlawful.

*In Matter of Verified Application & Petition of Liberty Energy (Midstates) Corp.*, 464 S.W.3d 520, 524 (Mo. banc 2015) ("*Liberty Energy*") (internal citations and quotation marks omitted). "[T]he interpretation and construction of a statute by an agency charged with its administration is entitled to great weight." *State ex rel. Sprint Mo., Inc. v. Pub. Serv. Comm'n of State*, 165 S.W.3d 160, 164 (Mo. banc 2005) (internal quotation marks

omitted). Nevertheless, "[w]hen determining whether the PSC's order is lawful, the appellate courts exercise unrestricted, independent judgment and must correct erroneous interpretations of the law." *State ex rel. Mobile Home Estates, Inc. v. Pub. Serv. Comm'n of Mo.*, 921 S.W.2d 5, 9 (Mo. App. W.D. 1996). "The PSC's order is determined to be reasonable when the order is supported by substantial, competent evidence on the whole record; the decision is not arbitrary or capricious; or where the PSC has not abused its discretion." *Liberty Energy*, 464 S.W.3d at 524 (internal quotation marks omitted).

## I.

OPC's first point on appeal alleges that the Commission erred in considering and granting MAWC's water ISRS petition because the ISRS in this case was not authorized by section 386.510.

Section 393.1003.1 states:

> Notwithstanding any provisions of chapter 386 and this chapter to the contrary, as of August 28, 2003, a water corporation providing water service in a county with a charter form of government and with more than one million inhabitants may file a petition and proposed rate schedules with the commission to establish or change ISRS rate schedules . . . .

It is undisputed that MAWC operates within St. Louis County and that St. Louis County has a charter form of government. *See, generally, Missouri Bankers' Assoc. v. St. Louis Co.*, 448 S.W.3d 267, 268 (Mo. banc 2014) (noting St. Louis County operates under a charter form of government). The courts of Missouri take judicial notice of the population of counties as determined by the United States Census. *State v. Van Black*, 715 S.W.2d 568, 571 n. 1 (Mo. App. S.D. 1986) (citing *State ex re. Alton R. Co. v. Pub. Serv. Comm'n*, 70 S.W.2d 52, 54 (Mo. 1934)). In 2000, the U.S. Census found the

population of St. Louis County to exceed one million inhabitants.  In 2003, the General Assembly enacted the current water ISRS scheme.  That scheme, as quoted above, allows for a utility to use an ISRS ratemaking mechanism in a charter county with more than one million in habitants.  However, after the law was passed, the 2010 U.S. Census found that the population of St. Louis County had dropped just below one million to 998,954.

OPC claims that, because in the most recent census St. Louis County had less than one million inhabitants, MAWC could not file an ISRS petition, because they were no longer subject to the provision of 393.1003.1.  MAWC first argues that this issue was not properly preserved for appeal.  Section 386.500 governs rehearing and appeal of a PSC order.  MWAC argues that section 386.500.1 prohibits the appeal of an issue not decided by the Commission in its original hearing.  Section 386.500.1 states that a party has a right to request rehearing "in respect to any matter determined therein."  By necessity, to issue an ISRS, the Commission had to find that the MAWC fell within the provisions of the statute.  Without this finding, the Commission had no authority to issue its ISRS.  "As a basic tenet of administrative law, an administrative agency has only such jurisdiction as may be granted by the legislature." *Tetzner v. Dept. of Soc. Servs.*, 446 S.W.3d 689, 692 (Mo. App. W.D. 2014).  "If the agency lacks statutory authority to consider a matter, it is without subject matter jurisdiction." *Id.*  Without a finding that the MAWC's current ISRS petition met the requirements of the statute, the Commission would not have had authority to act.  "The agency's subject matter jurisdiction cannot be enlarged or conferred by consent or agreement of the parties." *Livingston Manor, Inc. v. Dep't of*

6

*Soc. Servs.*, 809 S.W.3d 153, 156 (Mo. App. W.D. 1991). Thus, the application of the statute to MAWC's current ISRS petition is not an issue which may be waived by OPC.

Section 386.500.2 specifically governs the issues which may be appealed and states an appellant "shall not in any court urge or rely on any ground not . . . set forth in its application for rehearing." *See State ex rel. Office of Pub. Counsel v. Pub. Serv. Comm'n*, 236 S.W.3d 632, 636 (Mo. banc 2007) (any issue not raised in an application for rehearing is not preserved for review by the PSC or a subsequent appeal). A review of OPC's Application for Rehearing shows that its first argument was that "St. Louis County's Population is Less Than One Million Inhabitants." While the matter may have been determined in the hearing without much discussion, it was a necessary determination to issue the ISRS. Further, OPC's concerns regarding population were discussed, and rejected, by the Commission in its Order Denying Rehearing--the decision which OPC now appeals.

MWAC seeks to align this case with *In re KCP&L Greater Mo. Operations Co.* in which this Court dismissed certain issues raised on appeal because they were not properly raised before the Commission. 408 S.W.3d 175 (Mo. App. W.D. 2013). In *In re KCP&L*, the Commission had issued a number of orders and decisions relating to different aspects of a tariff approval. *Id.* at 188. The utility sought to challenge the rulings of a report and order from which it filed no application for rehearing. *Id.* This Court properly held that the utility was limited to challenging matters determined only in the order from which it had timely filed an application for rehearing and then properly appealed. *Id.* at 189.

In this case, the Commission only issued one order from which OPC timely filed a motion for rehearing, raising the population challenge, and subsequently timely filed an appeal of the Commission's denial. There is no issue, as there was in *In re KCP&L*, with OPC seeking to review a Commission decision that was not timely appealed by filing a challenge to a related but entirely different order. As such, the issue in this case is properly before this Court on appeal.

**A.**

The Commission and MAWC allege that there are three reasons as to why § 393.1003.1 continues to apply to St. Louis County and MAWC, despite the County's dip in population below one million people. The first is the plain language of 393.1003.1 which states:

> Notwithstanding any provisions of chapter 386 and this chapter to the contrary, as of August 28, 2003, a water corporation providing water service in the county with a charter form of government and with more than one million inhabitants may file a petition and proposed rate schedules with the commission to establish or change ISRS rate schedules that will allow for the adjustment of the water corporation's rates and charges to provide for the recovery of costs for eligible infrastructure system replacements made in such county with a charter form of government and with more than one million in habitants . . . .

§393.1003.1. Section 393.1003.2 continues that "[t]he commission shall not approve an ISRS for a water corporation in a county with a charter form of government and with more than one million inhabitants that has not had a general rate proceeding . . . within the past three years . . . ." MWAC argued, and the Commission found, that the phrase "as of August 28, 2003" creates a "snapshot" test that determines application of the statute as of that date. They argue that because the County had a population of over one million

8

inhabitants on August 28, 2003, section 393.1003.1 will always apply to the County. Not only would such an interpretation require a tortured reading of the statute, it would potentially render the statute unconstitutional.

Missouri's constitution prohibits "special legislation." *See Treadway v. State*, 988 S.W.2d 508, 511 (Mo. banc 1999). Generally, a statute is "special legislation" if it only applies to one person or entity. *Id.* A statute may apply to a particular class of political subdivisions even if at the time of the statute's passage only one subdivision meets the statutory definition. *Id.* This is permissible because other subdivisions may join the class if they later meet the requirements and leave the class if the requirements are no longer met and therefore it is not considered "special legislation." *Id.* ("The fact that currently the statute applies only to the St. Louis metropolitan region does not necessarily make the act a special law because the act can apply to other counties that attain the same statutory criteria in the future.") If, however, we accept MWAC's "snapshot test" then 393.1003.1 could only ever apply to St. Louis County and just as St. Louis County could never fall out of the statute, no other entity could later meet the qualifications. The charter and population requirements for a political subdivision would be fixed on August 28, 2003, never to change. "A law based on close-ended (non-changing) characteristics, such as historical or physical geography or constitutional status, is facially special because others cannot come into the group nor can its members leave the group." *City of DeSoto v. Nixon*, SC94746 at *7 (Mo. banc filed Jan. 12, 2016). A "snapshot test" would render the statute "special legislation" because it would only ever apply, and would always only ever apply, to St. Louis County. Absent substantial justification for having "special

9

legislation" the legislation would be unconstitutional. *See, generally, Jefferson Cty. Fire Prot. Dists. Ass'n v. Blunt*, 205 S.W.3d 866, 870 (Mo. banc 2006).

MWAC argues that its snapshot in time argument would not render section 393.1003 special legislation because, although the statute would forever apply to St. Louis County because the "snapshot" test determined to whom the statute applied as of August 28, 2003, the general population provision of section 1.100.2, discussed *infra*, would allow other counties that later acquired the requisite population to also fall under the statute. This interpretation, however, flies in the face of interpreting "August 28, 2003" as a "snapshot." It would unnecessarily read section 393.1003 to appear on its face to be unconstitutional, requiring the saving of section 1.100.2 to effectively read away the "snapshot" test for all but St. Louis County.

Instead, we find the phrase "as of August 28, 2003" more appropriately acts as an effective date.[3] "Absent a statutory definition, words used in statutes are given their plain and ordinary meaning with help, as needed, from the dictionary." *In Matter of Verified Application & Petition of Liberty Energy (Midstates) Corp.*, 464 S.W.3d 520, 525 (Mo. banc 2015). "[T]he mere fact that the litigants disagree over the meaning of [a statutory term or phrase] does not render the statute ambiguous." *J.B. Vending Co. v. Dir. of Revenue*, 54 S.W.3d 183, 188 (Mo. banc 2001). The phrase "as of August 28, 2003"

---

[3] Laws passed by the general assembly take effect 90 days after adjournment of the session unless a later effective date is stated there in or a shorter time is designated and the shorter time ("emergency clause") is approved by a two-thirds vote of each house. MO. CONST. art. III, § 29; Section 1.130 RSMo. *Dykes v. Gentry Cty.*, 193 S.W.3d 293, 294 (Mo. App. W.D. 2006). The general assembly adjourns on May 30th of each year. Mo. Const. Art. III, Section 20(a). Therefore unless a different date is legally established for a particular provision of a bill, legislation goes into effect on August 28 of the year that it is passed by the general assembly.

establishes the effective date of the statute. "[T]he phrase [*as of*] frequently signifies the effective date of a document . . . . When such a nuance is not intended, *as of* is the wrong phrase." BRYAN A. GARNER, A DICTIONARY OF MODERN AMERICAN USAGE 68 (3d ed. 2009). MWAC asks that we ignore the common and correct use of the term "as of" and instead read it as a date intended to modify "more than one million inhabitants."

We recognize that expressly setting an effective date of August 28, seems at first to be superfluous because effective dates are generally statutorily and constitutionally established. Section 1.130; MO. CONST., art. III, § 29. This seemingly redundant inclusion is, however, explained because section 393.1003.1 applies to the operations of an administrative agency. Administrative agencies are permitted to draft regulatory rules and procedures necessary to implement statutes. The implementation date of a statute may be delayed while an agency drafts and debates regulations. Placing the effective date in the language of the statute prevents the effective date or implementation date from being delayed due to rule making. In fact, this conclusion is supported by the language of section 393.1006.10, which gives the Commission authority to promulgate rules to implement the ISRS mechanism "but only to the extent such rules are consistent with, *and do not delay the implementation of*, the provisions of sections 393.1000 to 393.1006." (emphasis added). By this language the legislature wanted to make clear the ISRS provisions would be available on August 28, 2003, with no delay.

Further, we find that, were the phrase "as of" intended to modify the inhabitant requirement it would have been properly placed next to that condition. Had the legislature intended to create a "snap shot test" under which the population would be

11

judged only as of August 28, 2003, the date would have been properly placed directly following the population. Under the rule of last antecedent, "relative and qualifying words, phrases or clauses are to be applied to the words or phrase immediately preceding and are not to be construed as extending to or including others more remote." *Elliott v. James Patrick Hauling, Inc.*, 490 S.W.2d 284, 287 (Mo. App. 1973); *Paroline v. United States*, 134 S.Ct. 1710, 1720-21 (2014). The rule "is not inflexible and it has not been . . . adhered to where extension to a more remote antecedent is clearly required by consideration of the entire act. *Elliott*, 490 S.W.2d at 287. (internal quotation marks omitted). "[T]he safest and surest test to determine whether the general rule of the last antecedent or the exception thereto is to be applied is . . . (a) common-sense interpretation . . . bearing always in mind the mischiefs to be remedied and the benefits to be secured by the law." *Id.* (internal quotation marks omitted). Here, to modify "more than one million inhabitants," "August 28, 2003" should have been placed immediately after the qualification--more than one million inhabitants as of August 28, 2003. As constructed, the date more properly reads as an effective date under its plain and ordinary meaning. To read "as of August 28, 2003" as creating a "snapshot" of the population strains sentence construction because it is placed as far from the words MWAC argues it should modify. This can be seen when read together with subsection 393.1003.2 which includes the inhabitant requirement but contains no date qualifier. Common-sense dictates then that the population requirement is not to be applied to that term else we are left to conclude that the legislature erred in omitting it from subsection 393.1003.2.

MWAC argues that "as of August 28, 2003" cannot be intended to act as an effective date because the language does not match that used in another ISRS statue. Section 393.1012.1 provides that the natural gas ISRS is available "beginning August 28, 2003." We certainly recognize that use of the term "beginning" signifies that the statute "commences" or "starts" on the date given. BRYAN A. GARNER, A DICTIONARY OF MODERN AMERICAN USAGE 93 (3d ed. 2009). But, we do not believe that the use of a different term in section 393.1012.1 alters or changes the usual definition or use of a term in a different subsection. Both terms create an effective date or start date by which the terms of the statute take effect regardless of hindrances to the statutes application--such as promulgation of regulatory rules.

MWAC argues that a similar phrase was interpreted as a grandfather clause by this Court in *City of Harrisonville, Mo. v. Pub. Water Supply Dist. No. 9*, 129 S.W.3d 37 (Mo. App. W.D. 2004). In *City of Harrisonville*, the court was to determine the effective date of a statute. *Id.* at 38-39. The statute stated that it applied to political subdivisions that had a specified population and assessed value "which thereafter acquire such population or assessed valuation as well as those in the category at the time the law was passed." *Id.* at 39. The city contended that the statute was applicable because the effective date was the date the bill was signed by the governor while the water district argued the effective date was the date the General Assembly passed the law. *Id.* This Court determined that the plain meaning of "at the time the law passed" meant that the statute applied to political subdivisions meeting the statutory requirements on the date the law was passed by the General Assembly or those later acquiring such requirements. *Id.* at 40-41. We

13

made no finding that the phrase "at the time the law passed" should be interpreted to grandfather in a political subdivision that later loses population or valuation requirements. The court was only tasked with determining the meaning of the word "passed" as it appeared in the statute.

As with *City of Harrisonville*, the legislature set an effective date by which the law would become effective of August 28, 2003. As of that date, the ISRS rate scheme became available to a water utility operating in a county with a charter form of government and more than one million inhabitants. The statute, however, has no provision that states once a county has met the requirements of being a charter form of government and having one million inhabitants its classification can never change. Had the legislature intended to grandfather a county into the ISRS statute, it certainly could have written the legislation to say so. *See, e.g.,* § 67.1846(2) (defining a "grandfathered political subdivision" for the purposes of right-of-ways laws as a political subdivision which met certain criteria "prior to May 1, 2001"); § 311.090.1 (statute controlling sale of liquor in cities of a certain size notes "once such licenses are issued . . . any subsequent loss of population shall not require [voter approval] prior to the issuance or renewal of such licenses"); § 304.190 (establishing commercial zone of a city for traffic regulations noting in subsection 4: "[i]n no case shall the commercial zone of a city be reduced due to a loss of population"); §§72.040, 72.050 (governing classification of fourth class cities and villages stating that "notwithstanding the population requirements . . . [an entity] shall retain such classification at its option"). Instead, the plain language of the statute,

14

the language relied up on by MAWC and the Commission, is merely an effective date of the statute.

We believe that the OPC presents a more common-sense and logical reading of "as of" as an effective date. It is included to effect the legislative intent that, regardless of any regulatory rules that needed to be promulgated or procedures that needed to be implemented by the Commission for the ISRS scheme, as of August 28, 2003, water utilities would be able to apply for an ISRS to recoup costs of infrastructure replacement. As such, it does not act as a grandfathering clause forever allowing ISRSs to be collected by MAWC in St. Louis County.

**B.**

MWAC's second argument contends that, in the event that section 393.1003 is not found to have a "snapshot test," the County should still be grandfathered into the statute by application of section 1.100. Section 1.100 is a general statute governing determination of population to be applied by other statutory provisions. Section 1.100.1 provides, in pertinent part:

> The population of any political subdivision of the state for the purpose of representation *or other matters* . . . is determined on the basis of the last previous decennial census of the United States. For the purposes of this section the effective date of . . . each succeeding decennial census of the United States is July first of each tenth year after 1961.

(emphasis added). Counties are political subdivisions of the State. Mo. Const. art. VI § 1. When the General Assembly passed section 393.1003.1, St. Louis County met all the statutory requirements but, as a result of the 2010 U.S. Census, the County's population

15

dropped below one million. To determine the effect, if any, of the population loss on the availability of the water ISRS to MAWC, the Respondent's direct us to section 1.100.2. Section 1.100.2 states:

> Any law which is limited in its operation to counties, cities or other political subdivisions having a specified population or a specified assessed valuation shall be deemed to include all counties, cities or political subdivisions which thereafter acquire such population or assessed valuation as well as those in that category at the time the law passed. Once a city not located in a county has come under the operation of such a law a subsequent loss of population shall not remove that city from the operation of that law.

MWAC and the Commission allege that the phrase "as well as those in that category at the time the law passed" at the end of the first sentence acts as a grandfathering clause creating a "once in, always in" rule. Effectively, if a political subdivision meets a population requirement at the time a statute is enacted, that statute will always apply to that subdivision no matter the subdivision's population.

OPC contends that, plainly on its face, the statement "as well as those in that category at the time the law passed" is not a grandfathering clause but merely states that, at the time a law is passed, all political subdivisions that meet the population requirements are automatically included, as well as those that later meet the requirements. The language does not touch on what happens with a population loss or state that application of a law will not change. Its inclusion is merely to clarify that those political subdivisions that meet the population qualifications at the time a law is passed will be included, lest parties argue that a law only applies prospectively--to political subdivisions "which thereafter acquire such population." This is made clear when read in conjunction

16

with the second sentence which specifically addresses a decrease in population. When faced with a decrease in population the legislature saw fit to create a grandfathering clause for "a city not located in a county" but did not include any other political subdivision.

Our primary rule of statutory interpretation is to "effectuate legislative intent through reference to the plain and ordinary meaning of the statutory language." *In Matter of Verified Application & Petition of Liberty Energy (Midstates) Corp. v. Office of Pub. Counsel*, 464 S.W.3d 520, 524 (Mo. banc 2015). "This Court must presume every word, sentence or clause in a statute has effect, and the legislature did not insert superfluous language." *Id.* at 524-25 "In determining whether the language is clear and unambiguous, the standard is whether the statute's terms are plain and clear to one of ordinary intelligence." *Clanton v. Teledyne Neosho*, 960 S.W.2d 532, 534 (Mo. App. S.D. 1998). "We are not bound by the Commission's determination of ambiguity." *In re Laclede Gas Co.*, 417 S.W.3d 815, 820 (Mo. App. W.D. 2014). "When there is doubt and ambiguity as to the meaning of a statute, the courts give consideration to the practical construction placed upon the act by the agency charged with its administration, although such construction is not binding on the judiciary." *State ex rel. Competitive Telecomms. v. Mo. Pub. Serv. Comm'n*, 886 S.W.2d 34, 39 (Mo. App. W.D. 1994). "When 'the intent of the legislature is clear and unambiguous' by giving the statutory language its plain and ordinary meaning, both [the Missouri Supreme Court] and the court of appeals are bound by that language and cannot resort to statutory interpretation." *Simpson v. Simpson*, 352 S.W.3d 362, 365 (Mo. banc 2011).

To read the first sentence of section 1.100.2 to have a grandfathering clause would strip the second sentence of any meaning. "The issue is not whether a particular word in a statute, considered in isolation, is ambiguous, but whether the statute itself is ambiguous." *Cook v. Newman*, 142 S.W.3d 880, 886 (Mo. App. W.D. 2004) (en banc). "Thus, the meaning of a particular word in a statute must be considered in the context of the entire statute in which it appears." *Id.* We find that the statute is clear and unambiguous that only a city not within a county remains under the governance of a statute despite a loss in population. As to all other political subdivisions of the state, section 1.100 does not speak to a loss in population. Although one could possibly argue that the phrase "as well as those in that category at the time the law was passed" is ambiguous in isolation, its placement within the entire statute which otherwise creates a grandfathering provision based on loss of population for one particular type of political subdivision clarifies its intent.

Although we recognize that we do not resort to statutory interpretation where the language is plain and unambiguous, we find that the legislative history of section 1.100 supports and bolsters our finding as to the plain meaning of the statutory language. "To discern legislative intent, the Court may review the earlier versions of the law, or examine the whole act to discern its evident purpose, or consider the problem the statute was enacted to remedy." *United Pharm. Co. of Mo., Inc. v. Mo. Bd. Of Pharmacy*, 208 S.W.3d 907, 911-12 (Mo. banc 2006) (internal quotation marks omitted). "Statutory construction should not be hyper technical but instead should be reasonable, logical, and should give meaning to the statutes." *Id.* at 912.

18

Prior to 1971, section 1.100.2 was limited to the first sentence. §1.100.2 (1969).

The second sentence was not added until 1971.[4] Prior to 1971, section 1.100.2 read:

> Any law which is limited in its operation to counties, cities or other political subdivisions having a specified population or a specified assessed valuation shall be deemed to include all counties, cities or political subdivisions which thereafter acquire such population or assessed valuation as well as those in that category at the time the law was passed.

§1.100.2 (1969). Section 1.100 was amended in 1971 by HB 154 to address concerns that St. Louis City would fall below its prior population numbers in the 1970 census.

> Because of the population shifts in this state as indicated by the 1970 census there will be no statutes to govern certain political subdivisions of the state, therefore this act is deemed necessary for the immediate preservation of the public health, welfare, peace and safety, and is hereby declared to be an emergency act within the meaning of the constitution, and this act shall be in full force and effect upon its passage and approval.

H.B. 154 (introduced January 7, 1971). The only reasonable explanation for the amendment was that the legislature recognized that political subdivisions could fall out of laws and enacted an emergency statute to address the issue for St. Louis City. The legislature had the opportunity to address the issue for all political subdivisions and chose not to do so. The rule of statutory construction *expressio unius est exclusion alterius* mans "the express mention of one thing implies the exclusion of another." *Disalvo Props., LLC v. Bluff View Commercial, LLC*, 464 S.W.3d 243, 245 (Mo. App. E.D. 2015). Although the rule should be used with great caution, it allows an inference that

---

[4] Section 1.100.2 was amended by H.B. 154. Although we find that a review of legislative history is not warranted given the plan language of the section, we find it interesting to note that the original version of the bill used broad savings language: "Once a political subdivision has come under the operation of such a law a subsequent loss of population shall not remove that political subdivision from the operation of that law." Yet, once assigned to committee, the language was tailored to only apply to a "city not located in a county." Journal of the House, 76th Gen. Ass., 1st Reg. Sess., Eighteenth Day, p. 343 (Mo. Feb. 10, 1971).

obvious omissions by the legislature are generally presumed to be intentional exclusions. *Id.* Here, the legislature was aware of the possibility that political subdivisions could fall out of the provisions of a statute if they lost population. To remedy this problem they crafted a protection for one, and only one, subdivision. A review of the legislative history reveals that they edited boarder language that would have offered a universal protection to language protecting only one type of subdivision. As such, we find that applying the rule of *expressio unius est exclusion alterius* is warranted in this case. When the legislature expressly stated that it was amending section 1.100 to address the fear that St. Louis City would fall out of the control of statutes in the event that it lost population, it is clear that the legislature did not believe the language "as well as those in that category at the time the law was passed" already grandfathered political subdivisions.

This Court is to presume the legislature did not insert superfluous language and there is no reasonable explanation for the legislature amending section 1.100.2 to expressly provide for population grandfathering in St. Louis City if it was already provided for by the first sentence. We find that section 1.100 does not grandfather political subdivisions into statutory provisions except to the extent expressly provided.

## C.

The third and final argument for application of §393.1003.1, despite the County's stated population of 998,954, asks this Court to reconsider how population is calculated in this State. MWAC contends that although the 2010 U.S. Census found only 998,954 inhabitants, this did not account for military and civilian federal personnel living abroad. The U.S. Census does not break up personnel living abroad by county, merely finding

20

that, in 2010, 22,551 military and civilian personnel living abroad claimed residence in Missouri. The Commission and MWAC request that we proportionately allocate these 22,551 individuals by county. In 2010, St. Louis County had 16.68% of the population and thus, would receive an allocation of an additional 3,762 inhabitants, bringing the population of the County above one million.

As noted above, section 1.100.1 requires that the federal census be used to determine population of a political subdivision. Section 1.100.1 requires that population be "determined on the basis of the last previous decennial census of the United States" but, as MWAC points out, does not reference whether to include persons counted in the census as Missourians but not allocated to a specific county. MWAC notes that the U.S. Census did not include persons living abroad until 1970 so it is reasonable that the statute does not include reference to how to allocate their numbers. We note, however, that this also demonstrates that, in the nearly 45 years since the census started including persons living abroad, Missouri has not found it necessary to amend section 1.100.1 to specifically include them in a determination of population.

MWAC notes that the United States Supreme Court had recognized that "inhabitant" includes "persons absent occasionally for a considerable period of time on public or private business." *Franklin v. Massachusetts*, 505 U.S. 788, 805 (1992). While generally the term "inhabitant" might have such a broad inclusion, we find that the term "population" as used in section 393.1003 has a clear definition provided by section 1.100.1. While section 1.100.1 does not specifically exclude Missourians living abroad it fails to provide for a clear way to include them. We can find no indication that

21

Missourians living abroad have ever been included in population determinations under section 1.100.1.[5]  Such an inclusion would necessitate taking a clear and bright line determination--population as determined by the U.S. Census--and introduce speculation as to how many of the Missourians living abroad should be allocated to a specific subdivision.[6]  We will not introduce such confusion into a clear test when there is no indication that such is the intent of the legislature.  Had the legislature intended to include in a subdivision's population Missourians living abroad it certainly could have amended §1.100.1 at some juncture in the last 45 years.

> The Commission is a creature of statute and its powers are limited to those conferred by statute, either expressly, or by clear implication, as necessary to carry out the powers specifically granted.  If a power is not granted to the Commission by statute, then the Commission does not have that power.

*In re Laclede Gas Co.*, 417 S.W.3d 815, 819-20 (Mo. App. W.D. 2014) (internal citation and quotation marks omitted).

The County filed an amicus brief in support of the Commission and MAWC.  The County noted that, as of the 2000 U.S. Census, St. Louis County had a population of 1,016,300.  It was the only Missouri county with more than one million inhabitants.  During the period between 2000 and 2010, the legislature enacted many statutes referring to a charter county with more than one million inhabitants--effectively passing legislation

---

[5] *See, generally, Johnston v. Livingston Cty. Comm'n*, 462 S.W.3d 859, 867 (Mo. App. W.D. 2015) (applying §1.100.1 noting that Livingston County's population in 2010 was 15,195--the actual population recorded by the census, not the population as recorded by the census plus a proportional allocation of Missouri residents living abroad).

[6] The application of Respondent's argument is even more difficult if applied to the almost 1,000 separate cities and the thousands of other political subdivisions (school districts, fire districts, water districts, etc.) in the State.

directed at St. Louis County. According to the 2010 U.S. Census, St. Louis County lost 1.7 percent of its inhabitants, now having a population of 998,954.

If we determine, as we did above, that the County no longer meets the population requirements of these statutes, the County loses the benefit of those statutes enacted by the legislature with St. Louis County specifically in mind. While we agree this is the case, we find that the legislature was aware of the risk of population decline when it enacted these statutory provisions. "An appellate court 'must enforce statutes as they are written, not as they might have been written.'" *Disalvo Props., LLC v. Bluff View Commercial, LLC*, 464 S.W.3d 243, 249 (Mo. App. E.D. 2015) (quoting *Smith v. McAdams*, 454 S.W.3d 418, 421 (Mo. App. W.D. 2015)). If the legislature had wanted to grandfather St. Louis County into any statute with a population requirement it could have done so in section 1.100.2.[7] St. Louis City is grandfathered into statutes with population requirements by section 1.100.2's clear statement: "Once a city not located in a county has come under the operation of such a law a subsequent loss of population shall not remove the city from the operation of that law." Had the legislature intended the same treatment for all counties it could have easily adopted a broad grandfathering clause. It did not. Instead, after considering a broad grandfathering clause, the Legislature adopted a clause limited and specific to the City of St. Louis. Further, as can be seen from the statutes quoted above, the legislature felt it necessary to create specific grandfathering language and provisions in a number of other statutory sections demonstrating that, a

---

[7] We do not opine, as it is not before us, whether to do so would violate the special laws provision of our Constitution discussed above. *See, City of DeSoto v. Nixon*, SC94746 (Mo. banc submitted Jan. 12, 2016).

general grandfathering provision is most certainly not in section 1.100.2. Had the legislature intended narrow grandfathering of counties just into the ISRS statutes, the statute could have and should have been drafted as such. *See, e.g.,* § 67.1846(2) § 311.090.1; § 304.190; §§72.040, 72.050.

Although we accept that this ruling has wide reaching consequence for the County, it is an undisputed fact that--according to the 2010 U.S. Census--the County no longer has one million inhabitants. If the legislature intends for those statutes to continue to apply to the County, amendment is needed, a power limited to the legislative branch of our government.

### Conclusion

We find that there was no statutory authority under which the Commission could grant ISRS to MWAC because St. Louis County does not have at least one million inhabitants as required by the statute. As such, the Commission erred in granting MWAC's petition. This issue is dispositive and we need not address OPC's second issue on appeal. We remand with instruction to the Commission to dismiss the petition.

_____
Gary D. Witt, Judge

All concur

24